EDMUND HALL v. THE TITTABAWASSEE BOOM COMPANY.

*Boom-companies—Lien on logs—Use of streams.*

A boom company's statutory lien for running logs is acquired if the work is done by one who has contracted with the company to do it as the company's agent, and who is to be paid a gross sum for the job.

Individuals driving their own logs have the same rights as log-driving companies in streams that are navigable for that purpose; but if an individual practically concedes the right of a company to regulate the time of letting his logs into the stream, he waives any objection to its customary action in that respect, and if he is not prepared, when his logs enter the stream, to take care of them, he cannot complain if they become intermingled with the logs of the company and subject to its control, which it must exercise, however, in its own interest and in that of the owners of logs in its keeping.

Boom companies have a lien for their services in breaking jams and driving logs whose owners have not put on a sufficient force to do it, not only under the Boom statute itself (Comp. L. § 2793) but under the General Act relating to log-driving. Act 83 of 1879.

Where the logs of an individual owner have become intermingled with

those in the charge of a boom-company without his consent, but without the fault of the company, the latter acquires a lien for its services in driving them which it does not waive by refusing to deliver them to the owner on demand, unless he tenders not only a reasonable compensation for the services, but enough to cover the cost of separating his logs from the rest.

One who seeks to break a lien on the ground that the demand is excessive should tender what he himself considers reasonable.

A lien-holder cannot be said to refuse to state the amount he claims when he merely refuses to vary from schedule rates of which both parties have knowledge.

Where a log-owner demands all his logs from a boom-company which claims a lien for its services in driving them, the latter does not lose its lien by detaining more of the logs than is necessary to preserve it, though such a detention may possibly give ground for an action.

In an action involving the existence of a lien for services, a full showing should be had as to the items that go to make up the claim, and full cross-examination should be permitted. The reasonableness of the claim is for the jury, and they cannot be instructed as to their conclusions thereon.

One who holds property under claim of a lien is under no obligation to take it to a certain point, at the owner's request, merely to enable the owner to replevy it.

In replevin for logs on which defendant claims a lien for driving them and for storage, the jury cannot be instructed that the charge for storage should be proportioned to the length of time they were held, as this involves considerations of fact, and it might be unjust that an owner who should be favored with an early delivery of his property should also be favored with the smaller charges.

In replevin for logs on which a boom-company claims a lien for labor in running them down a particular stream, it is for the plaintiff to show that the company's articles of association did not authorize it to operate in that stream if it did in fact operate there.

Error to Saginaw.  (Gage, J.)  June 6-7.—October 10.

REPLEVIN.  Plaintiff brings error.  Affirmed.

*Edget & Brooks* for appellant.  A log-owner's right to control his own logs in the stream cannot be interfered with : *Atty. Gen. v. Evart Booming Co.* 34 Mich. 462 ; as to the liability for labor in running logs under contract, see *Johnson v. Cranage* 45 Mich. 18 ; *Edson v. Gates* 44 Mich.

253; a boom company has no authority to interfere with jams of logs not under its control, and not about its booms: *Ames v. Port Huron Booming Co.* 11 Mich. 139.

*Hanchett & Stark* and *John Moore* for appellee. Charges for running logs include money paid to laborers, cost of supplies and use of property: *Pere Marquette Boom Co. v. Adams* 44 Mich. 403; a lien is given by statute on every thousand feet of logs run for the work done thereon: *Mann v. White River Booming Co.* 46 Mich. 39; *Chadwick v. Broadwell* 27 Mich. 12.

COOLEY, J. The defendant is a corporation organized under "An act to authorize the formation of corporations for the running, booming and rafting of logs," approved February 4, 1864. The first thirteen sections of the act contain no provisions important to the present controversy. The fourteenth section has been several times amended, the last time being in 1881,—Public Acts, p. 237,—and now reads as follows:

"(2788.) Sec. 14. Every such corporation shall, by their corporate name, have power to acquire, use and hold all such real and personal estate, by lease or purchase, as shall be necessary for the purpose of carrying on the business of such corporation, with the full right of selling and disposing thereof, when not further needed for the use of such corporation: provided, that their real estate shall not exceed fifteen thousand acres. They shall have power and the right, in any of the navigable waters of this State, named in their articles of association, to construct, use and maintain all necessary booms for the business of such corporation: provided, always, that they shall first have obtained from the owner or owners of the shores along which, or in front of which, they desire to construct such boom or booms, either by lease or purchase, their permission to erect and maintain such boom or booms in front of his or their lands: and provided further, that such boom or booms shall be so constructed, and so far as practicable used, as to allow the free passage of boats, vessels, crafts, logs, timber, lumber or other floatables along such waters. They shall have power to make all necessary contracts for the driving, booming, rafting and running logs, lumber, timber and other floatables. They shall have power to carry on the

business of driving, booming, rafting and running logs, timber, lumber or other floatables, or either of them, as they may from time to time determine ; and for the use of said boom or booms in the care and custody of logs, timber, lumber, and other floatables, in all cases where no rate is fixed by contract, to charge and collect a uniform and reasonable sum for boomage, and for such boomage, and for driving, rafting, or running of logs, timber, lumber and other floatables, such corporation shall have a lien on the logs, timber or other floatables driven, boomed, rafted or run ; and such corporation shall be entitled to retain the possession of such logs, timber, lumber, or other floatables, or so much thereof as may be necessary to satisfy the amount of such boomage and reasonable charges for driving, rafting or running of logs, timber, lumber and other floatables, and all expenses for taking care of the same, until the same shall be determined, satisfied and paid in the manner hereinafter prescribed ; and whenever any such logs, timber, lumber or other floatables shall be delivered by any duly authorized corporation to any other duly authorized corporation, for transportation or delivery at its proper destination, such lien shall remain a lien upon such logs, timber, lumber or other floatables, for the benefit of such [said] first corporation, until the same shall have reached its proper destination ; and said first corporation shall be deemed not to have lost its lien on the said logs, timber, lumber and other floatables, and shall have the power to take and retain possession of the same, in common with any other party having a subsequently acquired lien thereon, or so much of the same as may be necessary to satisfy the amount of such boomage, and reasonable charges for driving, rafting or running of logs, timber, lumber or other floatables, until the same shall be determined, satisfied and paid in the manner hereinafter prescribed ; and all charges for running, driving, booming, towing or rafting of saw-logs and lumber by such corporation shall be by the thousand feet, board measure." [How. St. § 3917.]

The seventeenth and eighteenth sections provide for the enforcement of demands in favor of the corporations by suit; and the nineteenth is as follows, (Comp. L. § 2793 :)

"Sec. 19. If any person or persons shall put, or cause to be put, into any navigable river, creek or stream in this State, or shall have in any such river, creek or stream, any logs, lumber or timber, for any purpose, and shall not make

adequate provision, and put on sufficient force for driving or running the same, or for breaking jams of such logs, timber or lumber, in or upon such river, creek or stream, at the head of or along the side of such boom, or shall, for want of adequate provision, or want of sufficient force, allow such logs, timber or lumber to jam or accumulate at the head of such boom or booms. or along the side thereof, thereby obstructing the navigation of such river, creek or stream, it shall be lawful for such corporation, at the head of or along the side of whose boom or booms such jam or accumulation of logs, timber or lumber shall form, to cause such jams to be broken, and such logs, timber or lumber to be driven, boomed, rafted or run, at the expense of the person or persons owning such logs, timber or lumber; and such owner shall be liable to such corporation for the breaking of such jams, and the driving, booming, rafting of said logs, timber and lumber, and the cost and expense thereof; and such corporation shall have a lien on such logs, timber or lumber, for breaking such jams, and for driving, booming, rafting or running such logs, timber and lumber, and the cost and expense thereof, and shall be entitled to take and retain possession of such logs, timber or lumber, or so much thereof as may be necessary to satisfy the amount of such charges for breaking such jams, and for driving, booming, rafting and running of said logs, timber or lumber, and expenses and costs thereon, until the same shall be satisfied and paid ; and such corporation shall proceed to collect such charges, costs and expenses, in the same manner, in all respects, as provided in sections seventeen and eighteen of this act." [How. St. § 3922.]

The defendant has for several years been engaged in the business of running, driving and booming logs on the Tittabawassee and its branches, and was so engaged in the season of 1882. There was at that time in force an act, constituting chapter 43 of the Compiled Laws, the first section of which, as amended in 1879,—Public Acts, p. 83—

here given :

"Section 1. The people of the State of Michigan enact that section one of an act entitled ' An act to provide for the floating of logs and timber in [the] streams of this State,' approved March sixteenth, eighteen hundred and sixty-one, be so amended as to read as follows: That if any person or persons shall put, or cause to be put, into any lake, river, creek or stream of this State, any logs, timber or lumber

for the purpose of floating the same to the place of manufacture or market, and shall not make adequate provisions and put on sufficient force for breaking jams of such logs, timber or lumber in or upon such lake, river, creek or stream, or for running or clearing the same from the banks or shores thereof, or for running or driving the same, and shall thereby hinder the removal of any logs from the banks or shores thereof, or for running or driving the same, and shall thereby hinder the removal of any logs from the banks or shores thereof, or shall thereby obstruct the floating or navigation of such lake, river, creek, or stream, it shall be lawful for any other person, company, or corporation engaged in floating or running logs, timber or lumber in such lake, river, creek or stream so obstructed, to cause such jams to be broken, and such logs, timber, or lumber to be run, driven and cleared from the banks of such lake, river, creek or stream, at the cost and expense of the person or persons owning such logs, timber or lumber; and such owner shall be liable to such person, company or corporation for such cost and expense, and such company, person, or corporation so causing such jams to be broken, or such logs, timber or lumber to be run, driven or cleared, may have a lien on such logs, timber or lumber for his or their reasonable charges and expenses for breaking jams and running, driving and clearing the same, and shall be entitled to take and retain possession of such logs, timber or lumber wherever the same may be found, or so much thereof as may be necessary to satisfy the amount of such charges and expenses and all costs thereon, until the same shall be determined, satisfied and paid in the manner hereinafter prescribed."

The operations of the defendant were carried on upon the Tittabawassee river and its tributaries,—the Pine, the Chippewa and the Tobacco,—and were continued down into the Saginaw. The action now under review is replevin for four million feet of pine logs. The plaintiff testified that he was the owner of the logs; that he had placed the same in streams tributary to the Tittabawassee, for the purpose of running the same down to his mill at Bay City for maunfacture; that he was informed by the president of defendant that these logs had been run out of defendant's booms after July 26, 1882, and stored as the same were run out in defendant's store boom, known as the Melbourne boom,

upon the Saginaw river, and were composed entirely of logs cut in the season of 1881–2, and there was no contract made between the plaintiff and defendant in respect to the rafting, running or storing of the logs by defendant.

The plaintiff further testified that he had a conversation with the president of the defendant company, July 25, 1882, on the subject of the logs which were to be run out after that date. Plaintiff and defendant had disagreed in attempting to contract for the running of his logs, and plaintiff had insisted on running his own logs, and attempted to make an arrangement with the president to put men on and to divide the logs. They agreed to hit upon some plan, if possible, to modify the differences, and reduce them as much as possible. Mr. Weideman, the president, was very courteous, and very anxious to accommodate as far as possible. Plaintiff endeavored to make arrangements to put on men and divide the logs at some point,—anywhere that would be agreeable to the company, where his logs could be got at,—and told the president he had men employed, with tools ready, and offered to take his logs wherever he could find them, and endeavored to learn from Mr. Weideman whether he would be permitted to do this at any point. Mr. Weideman was somewhat reticent, but in some form of words he told plaintiff, as he understood it, that he would not be permitted to take the logs at any point; that all logs not under special contract would be taken and tied up at the Melbourne boom. Plaintiff, in this conversation, told the president he had a large boom at Bay City, and requested that his logs be stored there without expense, under control of the company, instead of in the Melbourne boom, but the request was not acceded to. At this time the plaintiff expressed his willingness to pay any charge the company might have upon the logs accrued up to that time, and had made the like offer before, but was uniformly advised by the president that he would receive nothing less than the full amount stated in printed stipulations, which the plaintiff had refused to sign.

A portion of plaintiff's logs were put into Chippewa

river about twelve miles west of Mt. Pleasant, above the boom limits of defendant; another part were put in on the Chippewa nearly in the same vicinity ; another part on the Coldwater, which is a branch of the Chippewa; a small portion on a branch of the Tobacco, and some on the upper waters of the Tittabawassee. The logs put in upon the Chippewa were run pretty late in the season of 1882, until they were stopped by jams below, and then they lay there quite a long time before the full jam was run into the boom limits; that the whole quantity of logs put in by the plaintiff was from eight to ten million feet, and to the best of his information the quantity driven into the boom limits of defendant was seven million feet; that in all cases the running which he did or had done was to the boom limits, and in the case of the Chippewa logs, the plaintiff contracted to have them run right down to the trips of the defendant, and to fill up all space clear to the trips, but he was unable to say whether it was done or not; that he had never run logs down in rafts below the defendant's booms; that at the time of the conversation with Mr. Weideman the logs in controversy were in the boom company's limits, but not rafted out; that he did not ask the president to deliver the logs at any particular point, but was endeavoring to secure the designation of some point on the river where he could co-operate with defendant in dividing his logs from the mass of the logs; that it would now seem that there was no place where he could co-operate with the defendant except at the rafting boom, but Weideman knew more about that than he did, and he wanted him to say. He heard nothing about it, that they were to be separated at the rafting boom. His impression was, from what he knew of the Bryant trip, that it was understood he could come up to that trip and run his logs through there, but he would not be certain about it. The work of taking the logs that were to be detained up there from those that were to go to Bay City, would have to be done at trips where they could be separated. The practicable way of doing this is to do it above Saginaw City, but he is unable to say how much room there

is there for doing it; he has not been there for several years. The way he understood it now was that the logs could not be separated at the Bryant trip, but should be run down and separated at the sorting gaps of the rafting boom. In the conversation he had with Mr. Weideman the latter would not tell him how much work had been put on his logs, and plaintiff did not know where they were, nor what the charges should be.

For the defense Mr. Weideman was sworn, and testified in substance as follows:

That he was acquainted with the Tittabawassee river from 1859 to the time of suit, and with the method of handling logs therein by the defendant; that defendant does no business except that of running, driving, booming, rafting and delivering logs; that it puts no logs into the stream and has no control over the putting of logs into the stream by others; that in the year 1882 the company received all logs on the Pine river at the company's dam, on the Chippewa river about three miles above the upper dam, called the Campau dam, about twenty miles above Midland, and on the Tobacco river at the dam about ten miles above its junction with the Tittabawassee. That after the logs are delivered into the limits the defendant causes men to be put on there, or, as was the case in 1882, by contract, for the breaking and driving the logs down the streams to the rafting gaps, and it also takes in the rear and cleans the banks and farms where the logs may be run out by high . water, and brings down the rear clean; that the times for taking in the rear vary in each year; that the company has trips or booms across the river,—one on the Chippewa and one on the Tittabawassee, just above Midland City,—for the purpose of keeping the logs there until the spring freshet subsides enough to make it safe to run below and prevent their spreading over the land adjacent to the streams, the banks below Midland being low; that when the water goes down the trips are left open and the logs are run out through them from time to time, as the company can take care of them and raft them out below; that in 1882 the

Tittabawassee in the spring was full of logs, the jam extending from Midland up about thirty-three miles, as near as the witness could estimate the same, of solid jam, and on the Chippewa there was, probably, four miles of solid jam of logs; and the Tittabawassee remained full until August or September, when defendant commenced to get a good deal of space; that about two hundred different owners put logs into the stream, bearing about twelve hundred different marks.

That in the spring of 1882 defendant contracted with Andrew J. Scott to take all the logs in and on the shores and banks of the Tittabawassee, Chippewa, Pine and Tobacco rivers, at and below the upper lines of the company's boom limits in said streams, and run the same to the Loretto House, some four or five miles above the Bryant trip, for the round sum of twenty-two thousand dollars.

That the Chippewa and Tittabawassee are navigable streams for the floating of logs anywhere within defendant's limits during the entire season, but dams are used on both streams to facilitate the getting down the logs, and are necessary to enable the company to drive the logs down the stream as rapidly as the company's facilities enable them to raft it out below. That the jam in 1882 on the Tittabawassee filled the whole river from bank to bank with logs two or three deep, and except for shore booms these logs would, on the rise of the stream, run out on the adjoining lands. As the water subsides the logs lie along the banks, and remain until the water rises again, and then the company must take them in. This is what is called taking in rear.

That all logs owned by different persons are mixed promiscuously together. The logs were run by Scott under his contract in 1882 to the Loretto House, and from there to the Bryant trip by the defendant, without contract. The Bryant trip or boom is across the Tittabawassee, about seven or eight miles above its mouth, where the entire mass of logs is stopped and held by the company. The trip can be opened and closed as necessity requires. Immediately

below the Bryant trip one-half the river is boomed and oc-
cupied by the defendant for the distance of four or five
miles, for passing its logs down to its rafting gaps, which
are reached about two and a half miles above the mouth of
the Tittabawassee river, and extend from that point to the
mouth.  These are a series of trips or gaps where the logs
are rafted.  The reason for booming and running the logs
only in a part of the river from the Bryant trip to the raft-
ing gaps, is to leave a portion of the channel open for
scows and other water-craft.  As the logs pass through each
rafting gap they are sorted, and those with certain marks
picked out, and the balance are passed down through the
other booms or gaps in succession : those with certain marks
being taken out each time, until the Fitzhugh boom is
reached, where the logs are rafted up.

That the stoppage of the logs at the Bryant trip is neces-
sary to turn them into the rafting booms, and all the space
in the river is occupied which is available for rafting pur-
poses.  The navigable part of the river is used for passing
out strings or rafts from the upper gaps down through the
lower sections.  Sometimes, when there is a vast accumu-
lation of different marks which there is not space to assort
in the sections and booms named, the same are run to and
assorted in the Green Point boom, so called.  In addition
to the booms named the company has store booms,—one on
the Shiawassee, one on the Saginaw opposite Wright's mills,
and two below Zilwaukee known as the Melbourne store-
booms.

That the quantity of logs rafted by defendant in the year
1882 was over 600,000,000 feet, the operations commencing
April 25th and lasting until November 18th.  The utmost
diligence was employed in getting out all the logs that
could be got.  The rafting consists, after the logs have
been assorted by marks, of shoving or towing the same into
the different strings, where they are pinned and the rope
put upon them, and the logs thus fastened together; and
when the string gets of length most convenient to handle,
they are run down to the making-up ground and there put

into rafts, and from that point they are towed down the Saginaw river to the various mills. In the opinion of the witness the separation could not be effected by any different process than that adopted. The logs in controversy were rafted out the same as other logs controlled by the company, and the charges not being paid they were towed to the Melbourne boom, which was the general storing ground of the company, and on the way to the destination of the logs at Bay City.

Witness had a conversation with plaintiff prior to July, when plaintiff stated he would put men on his logs within the boom limits on the Chippewa, and run the logs through. Witness told him he would let him know what time they would begin to move on the Tittabawassee, and did so. The Chippewa laid still early in the spring, while the old stock was being rafted out on the Tittabawassee. They struck the Chippewa and commenced rafting out about the 25th or 26th of July, and this conversation must have been in the first part of that month. Plaintiff did not, to the knowledge of the witness, have any men on to run the logs down the Tittabawassee from the Chippewa. The company let out logs from the Chippewa and the Pine ; at one time, for instance a week, a certain amount of logs, for instance fifty million feet, and then stopped, and if necessary, put a boom across the river and prevented the logs from running any more out of there, and then let them out of the Tittabawassee, in order *first*, that the respective owners in each stream might have a reasonable proportion of time on their logs; and *second*, to reduce the number of marks running in the stream and thus facilitate the rafting of the logs. The marks on the two rivers are entirely distinct.

That the logs put in the stream by plaintiff in the season of 1880–81 were all run out and stored in the Melbourne boom, and taken from there by plaintiff and charges paid July 26, 1882, and the logs now in controversy were then run to and stored in the Melbourne boom because plaintiff refused to pay charges on them, and the company held

them for their lien. Plaintiff's mill is six or seven miles below this boom. If plaintiff's logs were put into the river and no force employed by him to assist in running them, defendant would have to run them, as they would be so mixed with the general mass of logs that it would be impossible to bring the mass along without bringing these also. They would obstruct the running of other logs and obstruct the clearing of the banks. And it was only practicable to separate these logs from the others at the rafting booms where it was done. It could not be done at the Bryant trip. The work done on plaintiff's logs was not in any respect different from the work done on other logs handled by the company, and he could only get at the expense by taking an average by the thousand feet.

The witness was then permitted, under objection, to give evidence that in his judgment the expense and actual outlay of running the six hundred million feet of logs from the company's limits to the point where they were made up into rafts was 42.65-100 cents per thousand feet; from that point to the Melbourne boom 19.60-100 cents; and that the reasonable charge for storage in the Melbourne boom was twenty cents per thousand feet. Also that the reasonable rental value of defendant's property actually used in the business, aside from the Melbourne boom, was $20,000. The manner in which the witness made up his estimate was given in detail, and included items classified as labor, board, rear account, expense account, rope account, shore rents, rafting pins, insurance and taxes, scaling, damages, profit and loss and pile-driver account. In the rear account was included the payments to Scott and cost of repairing dams. In expense were included salaries to officers, directors and clerks. The item of damages was paid for the overflow of lands, and for permission to take logs off where they had been carried upon the land. The pile-driver account was expense incurred in repairing booms. The charges of defendant to log-owners are proportioned to the distance run and are uniform. It would be impossible to determine how

much expense was incurred on any particular million feet of logs.

The testimony of this witness tended to show that in the season of 1882 the logs might possibly have been all brought down without the aid of dams and floods, by keeping men steadily employed upon them; but they might not have been. The dams greatly facilitated the driving. It was the practice of defendant to boom the mouth of the Chippewa until the logs in the Tittabawassee had been brought down, and then to let the logs out from the Chippewa; that they run first from one and then from the other, without consulting the log-owners. The logs for the season of 1881 were let out of the Chippewa early in April. Then the jam was suffered to accumulate. It shut itself because the jams were very hard to break, and needed no boom to close it. It was not closed at that time by booms. The new logs were held back till the last of June or first of July; that being the general course of defendant.

The orders of witness for the season of 1882 were first, to run out of the Tittabawassee seventy-five or a hundred million feet of logs; then to break the jam of the Chippewa and Pine, and take in the rear of old logs as clean as possible, and work up to the new logs so as to be sure to get all of them. When the old logs were out of the Chippewa, the mass was to be stopped again, and this was done until further instructions to let them out were given in July. In the mean time Mr. Scott, under instructions from the company, practically held control of all the logs within the limits of its operations.

The plaintiff's logs could have been separated at the Bryant trip and turned out into the navigable channel by putting men on there and assorting the logs as they passed down, letting the plaintiff's logs pass out into the navigable part of the stream; but it would have cut down the work of the boom over two-thirds. Not more than two hundred million feet could then have been got down. There was no talk with plaintiff about permitting it, and it was so impracticable witness would not have allowed it. It would

have sacrificed the interest of log-owners as well as of the company. Witness thought the whole business was done with as much dispatch and as cheaply as was practicable.

Witness was informed in the spring by Mr. Briscoe, the plaintiff's agent, that he had secured a force of men and held them in readiness to take plaintiff's logs wherever they might be, and get them out of the way, and later, after the new logs came in, Briscoe gave witness written notice that he had men secured and on the ground ready to do it, and to care for the logs when the company turned them loose, or to take the logs wherever the company might see fit to assort them, and that he stood ready to assist in assorting them; witness replied that it could not be done for the reason that every place on the river was occupied during the work of assorting the logs, and told him substantially not to put men on at any point below the Loretto House and interfere with his work; that the company had all the men that were necessary.

When plaintiff requested the logs to be put into his own boom at Bay City, he gave witness to understand he would replevy them there. Briscoe offered at one time to pay 63 cents per thousand, and take the logs in Melbourne boom, or 73 cents for delivery at the mill in Bay City, which was declined. The number of men employed by defendant below Bryant trip was 550.

The entire running account of the company for 1882 was $96,754.86. In this was included $6250 for estimated depreciation on new tugs procured for the business at a cost of $25,000.

Further evidence was given for the plaintiff by Mr. Briscoe, and for the defendant by Mr. Burt, one of its directors, but it is not important to repeat it here. The evidence of Mr. Burt was directed mainly to the cost of operating the company's business. It was shown for the defendant that before the season of 1882 opened it had contracts with ninety-four log-owners for running their logs, and that it actually run the logs for two hundred and three persons.

The defendant waived a return of the logs in case of

judgment in its favor, and asked for a judgment for the amount of its charges.

In his charge to the jury the circuit judge instructed them that whatever was done by Scott, under his contract with the defendant, was done for and as the agent of defendant, and if any lien accrued therefor in favor of any one, it accrued in favor of defendant. He then proceeded:

"It is not disputed in this case, as I understand it, but that Mr. Scott ran all these logs from the extreme limits of the Tittabawassee Boom Company's booms to the Loretto House.

There is no evidence in the case, that I remember of, tending to show that Mr. Hall had any men upon the stream at all engaged in running logs or clearing the banks, or did any work upon them above the Loretto House.

There is some evidence in the case with reference to the request made by Mr. Hall upon the president of the boom company desiring to know when he would run logs out of the Chippewa river; but I don't remember of any testimony tending to show that Mr. Hall did any work above the Loretto House.

Now, with reference to the navigation of the tributaries and the navigation of the Tittabawassee river. All parties under the law have a right to put logs into these streams. The testimony in this case shows that these rivers were navigable to the extreme limit of the Tittabawassee Boom Company's operations at all seasons of the year, so far as their limits extended; that logs might be run by the natural flow of the water during all seasons of the year. Every person had a right to put logs into that stream or these streams to run; every person had a right of passage down the stream for his property. The right of navigation is really and simply the right of passage; but no person has a right to put property in the stream, with the intention of floating that property down the stream, without making some provision upon his part in the case of logs to prevent those logs from obstructing the general navigation of the stream, and he ought also to make provision with reference to the owners of the property along on the banks of the stream, so that these logs might not lodge upon the banks of the stream, and thus injure the property of the owner. If these provisions are not made, and the general floating or navigation of the stream is obstructed,—and that word " obstruct " in the statute may be defined; for the purpose of

this case we may consider it as synonymous with hindering, impeding, retarding."

Then referring to the statute of 1879, already given, the judge proceeded:

"If you find as a matter of fact that Mr. Hall put, or caused to be put, into the streams tributary to the Tittabawassee these saw-logs, for the purpose of floating the same to the place of manufacture or market, and that he did not make adequate provision and put on sufficient force for breaking jams of these logs, or for running the logs or clearing them from the banks or the shores, or driving the logs, and that in consequence of his failure to make such provision the general navigation of that stream was obstructed, then Mr. Scott, acting in the employ of the boom company, had a right, under the statute, to run these logs from wherever he might find them to the Loretto House; and the boom company being a corporation engaged in floating or running logs, a lien upon these logs would exist and attach in favor of the boom company for their reasonable charges and expenses.

Now this lien is not affected at all by the manner or action of the boom company with reference to floating their logs out of the Chippewa river. It is evident, from the testimony in this case, that so large a number are put into these several streams tributary to the Tittabawassee that the streams are choked, we might say, with the property; the extreme capacity of the stream is used.

Now it is evident that in order that parties putting logs into the Tittabawassee above the Chippewa might have the same opportunities that those upon the Chippewa have in the navigation of the main stream, and that parties upon the Chippewa may have equal rights with those upon the main Tittabawassee, that at certain periods of times the navigation of one river should be suspended; otherwise the entire stream might be obstructed, and the interest of neither party be advanced.

These rivers are but highways, and that plan is adopted wherever highways are obstructed. If you were to go during those seasons of the year when travel is quite extensive in the city of New York, in the lower part of Broadway, you would find that highway filled with teams, carriages, wagons, men on horseback—a continual procession—upon that street; you would also find that there were other teams, horses and wagons coming into that street from the side streets leading into it, and in such great numbers that they

cannot all pass and repass and move down the streets at the same time. Now the plan they adopt where the street is so extensively traveled, in that street, is to stop the travel entirely for a short period of time,—for instance, on Broadway,—until the wagons that gather in from the side streets are allowed to enter Broadway and pass down or out as they desire, and the hindrance in that side street is removed and they can go forward; and so each street in turn, that they may all have a chance to travel Broadway.

Now the same plan is adopted in Chicago. The Chicago river is spanned by numerous bridges. There is a continual travel up and down Chicago river; vessels, steamers, propellers, canal boats; and across the river, crossing the bridge, a stream of people, teams, wagons, etc.

Now the rights of the respective parties are considered, and for a time the navigation of the Chicago river by steamers is stopped until the travel may pass across the bridges, and then again the bridges are opened and they become blocked up on each side, so great is the extent of travel, until the steamers may pass.

The plan adopted upon this river is something similar to that, and a plan which has so far commended itself, wherever a highway is used to so great an extent that it becomes necessary.

As I understand the testimony in this case, for a limited period of time the main Tittabawassee is shut off in order that the property in these side streams—the Tobacco, Chippewa—may pass out; and then again the travel on these highways is temporarily suspended, and the property coming down the Tittabawassee is allowed to pass.

Now, so long as this is conducted with reference to the best interest of all parties having property on these several streams, and so long as the plan promotes the general navigation of the entire stream, and accomplishes the object that they all desire, namely, the speediest method and the least expensive in bringing this property to the common market on the Saginaw river, that plan, I charge you as a matter of law, is a proper plan, and cannot be complained of by the plaintiff in this case.

If the defendant in this case obtained a lien upon this property by reason of the labor performed upon it by Mr. Scott, it had a right to retain possession of that property until that lien was satisfied and paid.

We find from the testimony that in the navigation of that river below the Loretto House, a boom was placed across the river, and that the place is known as the ' Bryant Trip,'

that at that point the defendant stopped all the logs in the stream by means of this boom; and that their plan of operations with reference to the logs that they contracted to run, and other logs that were in their charge, and other logs that they were running, was to pass those logs from that point for four or five miles on the right-hand side of the river, and that piles had been driven near to the right-hand side, or near the center of the river, I think,—perhaps the testimony discloses,—but piles had been driven dividing the river as it were so that the logs might pass down upon the right-hand side, and that the other side might be used by other interests navigating the stream.

It appears by the testimony in this case, and is not disputed, that from the Bryant trip down to the mouth of the Tittabawassee river scows were in the habit of going up and down the river, and sometimes small steamers; that this channel was left open and unobstructed, so that that class of property might navigate the stream, and any one else who might desire to navigate through that channel might use it. In the opposite side they passed their logs until they arrived at their sorting gaps, several of which were constructed a short distance below the Bryant trip, and from that point to the mouth of the Tittabawassee.

An incident to the navigation of this stream with saw-logs is the sorting of the logs. It appears from the testimony in this case that there were 203, at least, different owners of property whose logs were stopped at the Bryant trip; that owners had several marks, so that there were 1200 different marks of logs. Now it is evident that at some point, at least some place, these logs must be stopped, in order that each party might take his own. A party putting logs into the stream and intermingling his logs with the logs of other parties was not only bound to provide for running and driving the logs, but he is also bound to provide for separating his logs from the common mass—to assist in the work of assorting at such a point in the period of navigation, during the time of navigation, when it is most desirable and least expensive, when the general interest, not only of the log-owners, but of others navigating the stream, would be best subserved.

The log-owners contracting with the boom company to do this work for them were acting in the line of their duty. Now, if Mr. Hall, plaintiff in this case, had desired to sort his own logs, he ought to put on a reasonable and proportionate force at the Bryant trip, or at some point where they could be best sorted; and if the boom company at that point

had acquired a lien upon its part, he ought also to have paid that lien, or tendered, by producing currency of the country denominated 'legal tender,' or gold, sufficient to discharge the lien. He then would have had a right to take possession of his property and do what he wished with it—do with it in such way as he might choose.

The boom company, having acquired a lien, had a right to retain possession of the property under this statute, and they had a right to separate that property from the common mass by sorting, and rafting it out and running it to a place of safety and storing it until heir lien was paid.

I said that the plaintiff, before he can take possession of his logs, must provide a reasonable and proportionate force to assist in sorting, and pay the lien or tender the amount. He might do this in lieu of payment of the lien; he might under section two of this statute, have offered a bond, approved in accordance with the statute, and with the penalty provided for in the statute, not less than double the sum claimed by the boom company: and giving such a bond would have been equivalent to a tender of the money; the statute provides for that. That section of the statute that provides for giving a bond provides that a condition of that bond shall be that the party will pay such sum as shall be found and determined as due for the charges and expense in breaking jams, running, driving and clearing the logs, and also providing for the care and safety of the same.

In construing the statute, we construe all the sections together, so that these acts performed by the boom company relative to the care and safety of the property are properly a part of the lien that they acquired by reason of the work performed by Mr. Scott.

You will remember the testimony as to what point on the Tittabawassee river these logs could have been best assorted, and the logs of the plaintiff separated from those of the other log-owners. If that was the best point, having the navigation of the river in view, and the interest of all the parties navigating, not only the owners of logs, but others, that was the point where he ought to have made his tender for any lien acquired up to that point; that is the point where he ought to have provided a sufficient force to assort his property from the remaining property in this mass,—the proportion reasonable, of course, considering the magnitude of the remainder of the property; and he should also have paid a lien or tendered a bond.

The next question to consider in this case is the matter of 'reasonable charges and expenses.' You will remember

that in reading these two sections, that in the first section they used the words 'reasonable charges and expenses,' and in the other clause they also used the words 'for the care and safety of the property.' The defendant in this case called Mr. Weideman, the president of the boom company, as a witness, and he testified that in his judgment the reasonable charges and expenses of the company in and about this property up to that point—up to the point of towing on the Saginaw river—was forty-two and 65-100 cents per thousand feet. That was his judgment.

Mr. Burt, I think, one of the directors, also testified in regard to it as his judgment. On cross-examination the counsel for the plaintiff desired, and properly, to ascertain the basis upon which this judgment was founded, and in consequence of questions put to the witnesses you have ascertained the basis upon which this judgment is based by Mr. Weideman and by Mr. Burt. They have said to you that it was impossible, from the very nature of the case, to show exactly the days labor or the actual expense put upon this four millions of logs; that their business was so great in its extent, and the property was all handled together, that the way they arrived at the reasonable charge and expense was by ascertaining the entire business for the year, and the total quantity of logs run and rafted by them, and the expenses incurred in and about their business; and they had made an average per thousand.

Now, it is, I think, the duty of the court to say to you what subjects might properly be considered by the boom company in making up this average, but whether the amount that they charged in each instance is a reasonable and proper sum or not, under the circumstances, is for you to determine. The expense of running and driving and clearing the banks of the streams of logs; all the labor performed upon them; the cost of rafting,—are all proper subjects to be considered in determining the reasonable charge and expense. These were necessary, at least. The law provides that if a party is navigating a stream, and that by reason of that navigation the waters of the stream are raised and overflow private property, that the parties shall pay reasonable damages to the party owning the property so overflowed.

Now, there is a mass of logs extending for many miles on the streams, and reaching from bank to bank; and Mr. Hall's (the plaintiff's) logs were a part of the common mass. Now, if by reason of that large quantity of property there floating down the stream lands were overflowed and damages resulted, it would be but reasonable that each party

having logs upon the stream should pay his proportionate share and expense of these damages. Therefore, I charge you that the matter of damages to land overflowed would be a proper subject for consideration.

The statute provides that before the boom company can transact its business it is absolutely necessary that they should obtain permission, either by lease or purchase, from the parties owning the property along the stream where they seek to establish booms, or trips, or sorting gaps; and therefore I charge that, as the statute requires them to do this, it is necessary that they should do it before they can carry on their business; that the matter of shore rents is a subject you may consider in deciding their charges.

Now, with reference to the repair of dams, the testimony of the president of the boom company, as I remember, is that the rivers were navigable through the entire season of the year by the natural flow of the water. Mr. Weideman tells us in his testimony that if, in the navigation of these logs down the river, they are allowed to proceed on only the natural flow of the water, while they would all flow down in time, yet it would take so long a time, and their progress would necessarily be so slow, that but a limited quantity could be rafted out of the river during any one year; and that, therefore, they have erected dams within the limits, not to create a navigation, because there is a broad distinction between making a navigation where none exists in fact, and accelerating, you might say, the navigation of these streams by this means, where a natural navigation exists at that time.

Now, if erecting these dams, accelerating the navigation of these tributaries of the Tittabawassee river, the streams being navigable themselves in all seasons of the year by the natural flow, and the cost of these dams did not increase the expense, but lessened it, and proved advantageous to the parties navigating the streams,—as I understand the testimony of Mr. Weideman, that the logs came quicker and at less expense, notwithstanding this expenditure of the money, than they would have come by the natural flow of the water, although they would have come in that way,—now that is something that the plaintiff in this case could not complain of; and especially so, as he must have known that these means existed and were used for the purpose. Therefore, the repair of that property is a proper item to be considered in ascertaining the expense of the boom company in their business.

A company of the character of the Tittabawassee Boom

Company must necessarily operate through agents. Its business is a very extensive business, involving the expenditure of thousands upon thousands of dollars each year. Such a business as that requires a board of managers; the statute provides for such a board, and provides that the board shall consist of not less than a certain number; they are obliged to have a certain number to manage this business; and the president has testified that he managed this business under the board of directors. It is necessary that they have book-keepers to keep an account of their transactions,—account of their transactions with Mr. Hall, as well as others, to be kept; the labor of the men upon those logs,—an account must be kept, and they must be paid; their board must be provided for, etc. Above all, such a company requires one general head.

Now, the item of the salaries of the officers of the boom company,—such officers as were necessary to properly transact its business,—and the salaries of the agents, book-keepers and such employes as were necessary for the boom company to have in order to carry on their business in a proper, business-like manner, are proper subjects to be considered in the matter of expense.

The testimony discloses that before the boom company could successfully carry on this work it was necessary that an amount of money should be expended in the building of boom and gaps; they had warehouses for the storage of their property, and offices for the transaction of their business, and a dock. Now, we look at this matter precisely the same as we would look at any other business matter, taking the common-sense, business-like view of it. Certainly a corporation of this magnitude, to carry on their business, do have need of warehouses and a dock; they certainly need a boom—it is apparent. Now a reasonable expenditure for these purposes is entirely proper, and therefore a fair rental value of the property used by them in their business is a proper subject for consideration in determining the cost of the work.

The matter of rope used in rafting the logs is a proper subject for your consideration,—the cost and expense of the rope—and I desire to say further in regard to the rope that if the plaintiff had any rope belonging to the defendant, he was not under any obligation to retain that rope unless he desired to do so, and if he returned the rope the defendant ought to credit him with the rope returned, at its fair value at the time of its return; and the result of such a credit

would be really to charge him with the depreciation of the rope in its actual use by him.

There are certain kinds of property used in ousiness, as you are all well aware, which depreciate in value by reason of its use. Its worth grows less every day that it is used. A merchant, in taking an account of stock at the end of the year, to ascertain what his profits are, will always take into account, if he is a good merchant, the depreciation of the stock below the cost price. If he calls his stock year after year worth just as much as it costs him, it he continues business any length of time, he will find himself a bankrupt, if he operates his business in that way.

Depreciation of property used in business is just as much a part of the expense of the ousiness, in the judgment of the court, as any other subject, and therefore a depreciation, for instance, of tugs would be a proper subject to take into consideration. And these things must be taken into consideration by business men — parties transacting business — before they can ascertain what their real profit is in the business.

Now, I have indicated to you the subjects that are proper for you to take into consideration. Of course, the towing of the logs is a proper subject, from the Tittabawassee river to the place of storage. The company had a right to provide for their care and safety, and, having rafted them out of the Tittabawassee river, they had a right to tow them to a place of storage, and provide for their care and safety, unless the plaintiff was there at the mouth of the Tittabawassee river and desired to take possession of these strings of logs or rafts of logs himself, and tender to the boom company their lien up to that point, or give his bond under the statute. If he was not there at the mouth of the river to receive these strings and make this tender or give his bond, they had a right then to tow these logs down to a place of safety and store them. Now the matter of storage is a proper matter for you to take into consideration.

Having given you the subjects that are proper and those that are excluded, whether the charges are reasonable or not, that is a question of fact for you to determine on these different subjects. Of course, you are to determine that from the evidence in the case. Mr. Weideman and Mr. Burt viewed these items as reasonable costs, they make the general statement that such a percentage, in their judgment, that these is reasonable, and therefore it follows in their judgment that these are all reasonable. Now, in determining whether they are reasonable or not, you are not to say what you

think they are worth, but where there is a dispute in this case as to whether the charge is reasonable or not, and that dispute arises from the evidence, you are of course to consider the evidence upon that point, and ascertain what the reasonable sum is from the evidence. There is a conflict here on the question of storage, and possibly on some of the other questions; you will remember from the evidence what other points there is a conflict of evidence about. You must determine from the testimony what, as a matter of fact, is a reasonable sum to charge for that purpose."

And after disposing of certain requests for instructions on the part of the defendant, the judge proceeded:

"Now what I said to you, gentlemen of the jury, is that the plaintiff in this case, if he sought to take possession of his own logs during the progress of the navigation of this river, that he ought to have been present, for instance, at the 'Bryant Trip,' where there was a navigable portion of the stream separate from the booms of the boom company, with a proportionate and reasonable force to assist in the assortment of his own logs, and that he ought to have tendered at that point, or some other point in the stream, the amount of the lien the company had acquired, or at any other point where I have stated that he ought to have made a tender or given a bond. I notice an amendment to the statute of 1864, in 1881, No. 200, which provides that all charges for running, driving, booming, towing or rafting of saw-logs or lumber by corporations organized under that act, should be by the thousand feet, board measure. I think that if a party tenders a certain sum per thousand feet, board measure, if it is sufficient to cover the reasonable charges and expenses per thousand feet, that a tender of such a sum would be sufficient, and that the company ought to release for each thousand feet paid them. Of course, no such tender has been made in this case, but it is to cover a point in the case where the boom company claim that this lien that they had extended not only to the four million feet of property, but they have a lien upon the 4,112,000 replevied for logs not yet run out of the boom. I think the lien is a lien per thousand feet for the reasonable charges and expenses of running, booming and rafting, and care of the property, and, when each thousand is paid for, it would be their duty to release it; and section two that we have been considering sustains that view in providing for a bond. The bond would be to pay—would be so much per thousand feet. I only speak of it so that there might be no miscon-

ception of what Mr. Hall might have done to take possession of his logs. I say there is nothing of the kind in this case."

Under these instructions the jury returned a verdict for the defendant of $3290.78, upon which judgment was rendered. The plaintiff brings error.

I. It is contended on the part of the plaintiff that defendant never acquired any lien by virtue of the work done by Scott under his contract: *First*, because the logs of plaintiff which the contracting parties did not know would be run at all, or, if they were, would not be cared for by himself, could not be considered within the scope of Scott's contract; and *second*, if they could be considered within the contract, the party who would have a lien upon them would be Scott, who performed the labor and was given possession of the defendant's property for the purpose, and not the defendant. We do not concur in either view. The contract contemplated that Scott should receive and run all the logs defendant would be at liberty to take charge of within the limits specified in the contract; but it contemplated that he should do so as agent and not otherwise. It was as competent for the defendant to employ Scott to perform the whole labor for a specified sum, as it was to do it all through numerous men employed by the day or month; and the defendant would be principal and entitled to the lien in the one case as much as in the other.

II. It is further contended that no lien could arise as against the plaintiff by reason of anything done above the Loretto House, because so long as the company, or the contractor acting under the directions of the company, exercised the power of holding back the logs at discretion, and of determining how long they should be run and when they should again be started, any individual owner was practically powerless to manage or control his own logs.

This contention presents one of the most serious of the many difficulties inherent in the business of running, booming and rafting logs on the small rivers of the State. The testimony in this case shows very clearly—what nobody dis-

putes—that in order to make the navigable quality of the streams serviceable to log-owners it is essential that the use be either regulated by a single head, or be managed by the numerous parties concerned with greater fairness and more constant care for the interests of others than can reasonably be looked for.    These streams are highways in which every man with occasion to use them has equal rights.    But the logs thrown into them demand facilities far beyond their natural capacity; so that the illustration of the crowded streets of New York, made use of by the circuit judge, though forcible, is far from being adequate; for in these it is not only necessary to check the movement in one to allow it to proceed in another, but it is necessary to do more, and accelerate the movement by artificial floods as the only means of bringing the logs to their destination within the year. These artificial floods the defendant has provided for at great expense.    It has also purchased or leased extensive booming grounds, and constructed booms which are indispensable to the business, and it employs a body of officers and a large number of men regularly, whose business it shall be to make the streams within its limits perform the service of which they are capable.    All these preparations and expenditures do not give to the defendant superior rights to the plaintiff, and we find no evidence in the record that the defendant claimed superior rights until after the logs had been delivered at the Bryant trip.    Plaintiff requested that he might be informed when the jam would be let out of the Chippewa, that he might put on men to take charge of his own logs.    He seems to have made no objection to the time of letting out the logs being determined by defendant; he made no request that they be let out at any different time, or any attempt to let them out himself.    All he asked was that he be informed when it was to take place.    This may well be taken as a concession on his part that the defendant, who represented 202 log-owners in the navigation, and who had made extensive and costly preparations to make the navigation as effective as possible, was better entitled to regulate the passing of the jams than any single log-owner

could be, and as a waiver of any objection to its customary action in that regard.

The plaintiff did not put men on, as he contemplated doing, and the evidence that it then became necessary to run his logs with the others is unquestioned. No one claims that it would have been practicable to separate them until the rafting gaps were reached.

III. It is further urged that the circuit judge was in error in instructing the jury that the defendant might acquire a lien under the statute of 1879 for the services performed in running the plaintiff's logs down to the company's booms. The defendant is incorporated under the Act of 1864,— Comp. L. ch. 88,—and that act, it is said, makes provision for such services as it is authorized to perform for others and for the lien it may have therefor. And the lien is only given either (1) when the log-owner has failed to make adequate provision or to put on sufficient force for driving or for breaking jams at the head of or along-side of the company's booms, thereby obstructing the general navigation of the stream; or (2) when the log-owner, for want of sufficient force or adequate provision, actually allows the logs to accumulate at the head of or along-side of the company's booms, thereby obstructing the navigation of the stream. It makes no provision for services above the head of the booms.

It is not disputed that the general act, as amended in 1879, makes provision for services in preventing jams or obstructions above the booms, wherever the navigation is or may be affected. The terms of that act are as general as could well be, and it purports to empower "any person, company or corporation" to perform the service which the owner of the logs has neglected. We do not perceive any ground on which we can say that this means, not what it says, but any person, company or corporation except the very corporation who would be best prepared to perform the service, and could do it with most expedition and economy. A much more reasonable inference would be that the Log driving and Booming companies were the corpora-

tions the Legislature specially had in mind, not only because their own business would invite the intervention, but because, in so far as the service was one in the public interest, they could best perform it. And there is no incongruity and no confusion in holding that the defendant may have the benefit of the general law and also of the act under which it is incorporated.

IV. It is further claimed that if defendant had any lien upon the logs of the plaintiff at the time demand was made for their delivery, the lien was waived or lost by the refusal of the president to deliver the logs when demanded, or to specify what the expenditures of the defendant in respect to them had been, or to accept anything less than the full contract rates of the defendant for running, booming and rafting them.

To understand the bearing of this claim it is necessary to review briefly the course of things up to the time when the demand and refusal took place.

The plaintiff and a large number of other persons had put logs into the Tittabawassee and its tributaries without making provision for running them. Every log which was put in assisted in forming a jam; and the evidence shows very clearly that without the intervention of somebody with a large force of men—*first*, to keep the logs within the banks during the continuance of early spring floods; *second*, to pass the logs from the tributaries into the main stream; and *lastly*, to break the head of the jams and keep them in motion,—it would be absolutely impossible that all the logs, or even the major part of them, should be brought down at all. Some of them would be stranded on adjacent farms and give rise to actions for damages, the others would block up the stream, neither moving forward nor permitting the navigation of the stream by boats or otherwise. It was in this condition of things that the defendant intervened to move forward the logs in the direction of their destination, and at the same time to provide for and protect the general navigation. Its very heavy expenditures for the purpose and the large force employed

rendered this possible ; and its services were not only valuable to all the log-owners, but, so far as the testimony shows, must have been indispensable.

But while the defendant was performing these services, its officers and agents could not distinguish between the logs of different individuals, and could not know or assume that one log or batch of logs cost them more or less trouble or labor than another. Logs bearing twelve hundred different marks were cast together into the waters within the limits of their operations; and every log assisted in forming the jams and required like care with the rest. Any attempt to distinguish between the logs by the only possible method, namely, by the marks, would necessarily have impeded the running, for it would have required a separate examination of each log ; and even this could have been of no value unless the logs bearing the same marks could be brought together and separated from the rest; and this was impossible except at the sorting gaps. When, therefore, the plaintiff put his logs into the limits covered by the operations of the defendant, and they were taken charge of to be run by the defendant, it was indispensable that they should be run to and through the sorting gaps, for the very plain reason that they could not sooner be delivered without stopping the navigation of the stream for the purpose. But this would have been a public nuisance, and would inevitably have led to difficulty and litigation. The demand, therefore, for any delivery except at the sorting gaps or below there must have been futile, because impossible to be complied with.

The plaintiff, however, was entitled to receive his logs at the first place where it was practicable to separate them from the mass without unreasonably impeding the navigation ; and if he tendered reasonable charges up to that time and failed to receive the logs, he could be charged nothing by defendant for their subsequent care. But the plaintiff appears to have demanded the privilege of putting his own men on to assist in the separation of the logs. Whether men not under the direction and control of defendant could have been of assistance in this work we do not

know; but as it must necessarily be done within the booms which the defendant had constructed and was maintaining at heavy expense, it could not have been the right of the plaintiff to avail himself of these booms for the purpose without making some allowance therefor. The plaintiff had the same right with the defendant to procure land and construct booms for the reception and sorting of logs. He has not exercised that right; and it is not necessary to look beyond this record for reasons amply sufficient to account for this. With a jam of logs thirty or forty miles in length, filling the stream two or three deep, and mixed, as they must be, promiscuously together, it is apparent at a glance that sorting booms under different managements must impede instead of aiding each other, and that all parties concerned must find their interest subserved by permitting some one to construct the booms and take charge of the business. It is only upon this ground that we can account for the fact that all this large number of men having an interest in navigating the Tittabawassee and its tributaries for logging purposes, have refrained from constructing booms for gathering and assorting the logs as they are brought down, and left their construction and management to the one corporation that has seen fit to invest the necessary capital. But when they do so, and then avail themselves of the facilities afforded, they must make reasonable compensation. And whether we call what the defendant is entitled to demand reasonable compensation or reasonable costs and expenses is immaterial, for it comes to the same thing. The logs cannot be handled, cared for and sorted without the expenditures which the defendant has made; and these must necessarily be taken into the account in determining what the handling, care and sorting have cost.

But the defendant could not fix its charges arbitrarily, or bind the plaintiff by its schedules. When the president showed the schedule and refused to vary from it, or to deliver the logs until the full rates were paid, the plaintiff might have done at once, what he did afterwards at the Melbourne boom,—replevy the logs and go before a jury on the question

of the reasonableness of the charges made. If he wished to cast upon the defendant the risk of expenses in litigation, he could have made tender of the amount he deemed reasonable, before beginning his suit. But any tender must have covered the cost of delivering the logs to him; and this, as has been seen, must have been a delivery at or below the sorting gaps. He could not take them while they were unassorted in the jam.

The position of things, then, at the time of the demand was this: Neither the plaintiff nor Mr. Weideman, managing for the defendant, knew where the logs then were, except that they were somewhere above the sorting gaps. The plaintiff demanded them, expressing a willingness to pay reasonable costs and expenses upon them up to that time, and to assist afterwards in separating them. Mr. Weideman insisted upon full schedule rates as reasonable and refused to accept less. He also refused to allow the plaintiff's men to come within the boom of the defendant to assist in the sorting and delivery. Whether in this last he was right or wrong is immaterial, and we need not add to what has already been said on the subject. The offer of the plaintiff fell short of the just rights of the defendant, for it allowed nothing for the necessary cost of separation and delivery. And if Mr Weideman demanded more than was just, the plaintiff failed to, take advantage of his fault by making a tender of what he considered reasonable. The lien would therefore continue, and the logs would go forward subject to it, and subject to such further charges as were incident to their case.

In the brief for the plaintiff it is said that Mr. Weideman refused, when the demand was made, to name any sum he claimed; but it cannot be said that he left the plaintiff in any doubt on this point. He insisted upon the schedule rates; and it appears from the testimony on both sides that the parties had had negotiations respecting these rates, and had them in print. They were, besides, the same rates which were charged to others, and must have been matter of public notoriety. What Mr. Weideman refused to do was to name any sum variant from these.

V. The point is made further that the defendant retained all the logs when a comparatively small portion would have been sufficient for the protection of its lien. No question of this sort appears to have been made before the suit was brought, but the plaintiff demanded all the logs and the defendant refused to deliver them before its charges were paid. If demand had been made in such form as to present the question, and defendant had persisted in retaining all, it might then have become necessary to decide whether the lien was general, covering all the logs of a particular owner, and attaching for the whole amount on any part not surrendered up, or whether the lien was upon each particular thousand feet of the logs, or upon each separate batch of logs, and would be waived to the extent that any were delivered up without payment. But these questions are not in the present record. The lien was upon all the logs, and an unnecessarily excessive detention might possibly have given ground for an action, but could not of itself amount to a forfeiture of rights.

VI. Several questions are made regarding the basis which it was admissible to put before the jury for their estimate of the proper charges to be made by the defendant. The circuit judge permitted a very full showing of defendant's receipts and expenditures, and full cross-examination in respect to them; and this seems to us the only proper course to pursue. It could then be seen by the jury at what expense the defendant was moving and delivering the quantity of logs expressly or by implication committed to its care, and if in their opinion any item of expense was unnecessary, or excessive, or not roperly chargeable to the business, they could exclude it from consideration in making up their estimate. Mr. Weideman made an estimate of what should be charged to each thousand feet of logs, but he at the same time gave the basis for this estimate, and the jury were thus enabled to judge of its reasonableness. The whole subject properly belonged to them, and the judge was not at liberty to instruct them as to the conclusion they should reach.

The judge was requested to instruct the jury that if the

plaintiff in good faith offered to receive and store the logs in his own boom at Bay City without charge and without surrender of any lien, it was the duty of defendant to take them there, and it could not charge for storage while declining to do so. But what appeared was that plaintiff desired the logs taken to his boom for convenience in taking them on writ of replevin; and it does not seem that defendant was under obligation to assist in that. The logs might have been replevied at or above the Melbourne boom as well as at Bay City.

It was claimed that the charge for the storage of the logs ought to be proportioned to the time they were retained; but an instruction to that effect could not have been admissible, because the considerations involved are of fact, not of law. But the statutes governing the case aim at uniformity of charge and burden among the several log-owners, and it may be that a jury would find it grossly unjust, under some circumstances, that the owner who was favored with the first delivery of logs should be favored with the smaller charges also.

The point is also made that a part of the logs were put into the Tobacco river, and that defendant is not entitled to make any charge for running them, because, by its articles of association, its operations do not extend to that stream. But the answer to this is that there is no showing that the Tobacco river is not within the limits of defendant's operations as defined in its articles. It certainly was within them as actually conducted.

No error appearing in the record, the judgment should be affirmed with costs.

GRAVES, C. J. and SHERWOOD, J. concurred.

CAMPBELL, J. I have had some difficulty in satisfying myself that the record in this case does not contain errors. But the complications are such upon the facts that it seems to me no way has been pointed out whereby the jury could have been guided to any more satisfactory conclusion. The anomaly under our laws of a practical appropriation by one

company of the control of a navigable stream is a serious.
matter, and I am not prepared to say that, without State
regulations sufficient to adequately protect all rights, the·
action of defendants is not open to legal complaint.

But in this case plaintiff dealt with defendant in regard·
to the running of his logs within certain limitations, and re-
cognized them as authorized to handle them.   Under such
circumstances, and without some agreement to the contrary,
it could not be expected that they would be required to be·
compelled to do anything in the final dealing with them
which should imperil or complicate the other large interests.
in their custody ; and as the case stands I think the matter
was left properly to the jury for want of any more tangible·
basis of calculation than they had before them.

I concur in the result.

The other Justices concurred.