THOMAS G. SULLIVAN v. THE ESTATE OF JAMES G. ROSS, DECEASED.

*Contracts—Fraud—Laches—Statute of frauds—Part performance.*

1. Where a party admits, by writings covering a period of three years, the existence of a contract, and acts upon it, he cannot, after the lapse of five years and four months from its execution, be permitted to raise the question of fraud in its procurement.

2. Weight must always be given to the *fact* of the execution of a contract; and the presumption which exists in favor of written instruments, not unconscionable in their character, but mutually advantageous in their provisions, and executed by parties competent to contract, and between whom no fiduciary relations exist, and in the presence of witnesses who affix their signatures as such, cannot be overcome except upon testimony from which an inference of duress, deception, misrepresentation, substitution, or artifice is clearly deducible; citing *Campau v. Lafferty*, 50 Mich. 114; *Houghton v. Ross*, 54 Id. 336; *Taylor v. Fleckenstein*, 30 Fed. Rep. 99.

3. The rule adopted by courts of equity in actions brought to enforce the specific performance of verbal contracts for the sale of land, that a party who sets up part performance to take the contract out of the statute of frauds must show acts unequivocally referring to and resulting from that agreement, and done with a direct view to its performance, is equally applicable to actions at law founded upon contract.

4. A proper regard for the purpose of the statute of frauds will not permit a party to avail himself, as part performance, of acts done which, by numerous voluntary writings, he has related to another and different transaction.

Error to Marquette. (Stone, J.) Argued October 26, 1893. Decided February 6, 1894.

Appeal from the disallowance of a claim against the estate of decedent. The estate brings error from a judgment of allowance. Reversed. The facts are stated in the opinion.

*Clark & Pearl* (*John D. Conely,* of counsel), for appellant.

*Moore & Moore, T. E. Tarsney,* and *Ball & Hanscom,* for claimant.

McGRATH, C. J.    In September, 1882, Ross & Co., of Quebec, Canada, contracted to sell to one Prentiss certain standing timber on lands near Grand Marais.    Prentiss let the contract to cut the timber to Sullivan, who had gotten out about 4,000,000 feet when Prentiss failed.    Ross & Co. took possession under his contract, at which time Prentiss was indebted to Sullivan.    Ross & Co., in the fall of 1883, permitted Sullivan to take the logs already skidded at a given figure, and made a new contract with Sullivan. October 9, 1883, Sullivan executed to Ross & Co. a chattel mortgage on his logging outfit to secure contemplated loans to the amount of $10,000, which were to be repaid by May 1, 1884.    On November 7, 1883, the contract between Sullivan and Ross & Co. was reduced to writing.    Sullivan was to get out 10,000,000 feet, and to remove same to rollways on Lake Superior.    The title was to remain in Ross & Co., and Sullivan was prohibited from removing the logs from said rollways until they were paid for.    On December 18, 1883, an agreement was entered into between the same parties, whereby Ross & Co. were to advance, to carry on the work, $17,243.45, which was to be paid by June 1, 1884, and, until paid, Ross & Co. were to retain title, and have a lien until stumpage and advances were paid.    As additional security, Sullivan, on the same day, executed to Ross & Co. a chattel mortgage for $30,300, payable June 1, 1884, and a real-estate mortgage for $7,000, payable according to the terms of the agreement aforesaid.

Plaintiff claims that under these agreements he had upon the rollways in the spring of 1884 at least 9,000,000 feet of lumber in the log; that there was then due to Ross &

Co. for stumpage and advances, $48,200; that he had negotiations with several parties for the sale of said logs at $8.50 per 1,000, or $6 for shipping culls, $12 for common, and $33 for uppers; that these negotiations fell through because Connolly, acting for Ross & Co., refused to accept the terms made for payment of amounts due them; that in March, Connolly, acting for Ross & Co., agreed to take the logs at $6.50 for shipping culls, $12.50 for common, and $33.50 for uppers, and a contract to that effect was prepared and signed; that afterwards Connolly notified him, that Ross & Co. refused to go into the deal,— that they did not want to buy that amount; that negotiations were then made with others for the sale, which continued until the latter part of May, 1884; that finally, on May 28, 1884, Connolly, Sullivan, and one Weller were at Alpena, for the purpose of concluding a sale of the logs to Collins & Johnson; that the terms of payment of advances and stumpage were not satisfactory to Connolly, and that deal was not consummated; that plaintiff left Alpena on May 28, the others remaining; that on June 1, 1884, plaintiff, being very anxious to effect a sale of the logs, so as to pay his obligations to Ross & Co., met Connolly at St. Ignace, and then and there Connolly, for Ross & Co., agreed to take the logs at 9,000,000 feet, and pay therefor $9 per 1,000; that Ross & Co. were to cancel Sullivan's indebtedness that day, and pay him the balance when the logs were sold, or, in case the logs were cut into lumber, when the lumber was sold; that the logs were to be taken to Sault Ste. Marie, and plaintiff was employed at $100 per month to superintend the rafting. This alleged agreement was verbal. One Spencer, who was, and still is, a creditor of Sullivan, claims to have been present, and corroborates Sullivan. The logs were rafted, and towed to Sault Ste. Marie. The towing was commenced about June 15, 1884, and finished about October 1, 1884. Ross died

in October, 1888. Ancillary administration was had in this State, and Sullivan presented a claim against the estate for the contract price of the logs, less stumpage and advances. The commissioners rejected the claim. Sullivan appealed to the circuit, and had judgment for $70,-417.70. The estate appeals, claiming a balance due the estate of $23,564.43.

The estate insists that no such contract was ever made as is set up. Connolly testifies that he had no talk whatever with Sullivan at St. Ignace; that he did not meet or see him there. The contention on the part of the defense is that the rafting of the logs to the Sault was, in the first instance, to be done by Sullivan on his own account; that when at Alpena, on May 28, 1884, after the failure to agree upon a sale to Collins & Johnson, Sullivan made a written proposition to Ross & Co., in which, after reciting his inability to pay his indebtedness, he says:

"I now propose, if you make me the necessary advances, to raft and tow the logs to Sault Ste. Marie at my risk and expense; when there, to be sold by you to the best advantage, in order to enable you to repay your advances and stumpage; the logs and securities which you now hold to remain in your possession until you are paid your account, interest, and commissions, and further advances made to be on the same terms and conditions as that already made."

That Connolly then and there telegraphed to Ross & Co., at Quebec, and received an answer, saying:

"Prefer selling. Act as considered best, holding securities. Sullivan must pay your time attending business."

That thereupon Connolly, on behalf of Ross & Co., accepted Sullivan's proposition, and drew a draft upon Ross & Co., which was received, indorsed, and the proceeds appropriated by Sullivan, and Sullivan receipted for the amount; that Sullivan then requested Connolly to assist him in procuring tugs for the work of rafting the logs to

the Sault; that Sullivan then left Alpena; that afterwards, at the Sault,—at just what time does not appear,—it was agreed that the logs should be cut up into lumber on joint account; that, in accordance with that understanding, he (Connolly) went to Marquette, and had a type-written agreement, consisting of two pages, prepared in duplicate by Mr. Clark, an attorney, brought it to the Sault, and submitted it to Sullivan; that Sullivan objected to some of its terms, whereupon Sullivan, Connolly, and one Weller went to the office of E. S. B. Sutton, an attorney at the Sault, when, after some time spent in discussing the matter, interlineations were made by Sutton in the writing which had been prepared by Clark, a third type-written page was added, and the agreement was then and there executed by Sullivan and Ross & Co., per Connolly, and witnessed by Sutton and Weller.

The agreement recites Sullivan's inability to pay the indebtedness, and his desire to remove the logs to the Sault, or any other place, at the option of Ross & Co., and obtain further advances for such removal, and Ross & Co. thereby agree to make advances "for the purpose of towing and delivering said logs," and "paying for the sawing" thereof; and it is agreed that Ross & Co. "shall have the same right to the said logs and lumber" as they have under former agreements; that the removal of said logs shall be at the risk and expense of Sullivan; that, from the sale of the logs or lumber, Ross & Co. shall first be paid all advances and stumpage, and, if a profit shall remain, Sullivan shall receive one-third and Ross & Co. two-thirds thereof. And then occurs what was added to the contract by Sutton, and all of the third page of the instrument, which is as follows:

"And the basis of the division of the profits shall be based upon the prices mentioned in a contract drawn but not entered into between the parties hereto, and now in

the hands of F. O. Clark, of Marquette, except as to mill culls, and, as to those, they shall be equally divided between the parties hereto. Basis of value of Norway pine to be $6 for long and $4.50 for short logs, and profits to be divided as above stated. And it is mutually agreed by and between the parties hereto that Ross & Co., of the second part, shall have the right to pay all the moneys mentioned in this agreement as a further advance for towing and cutting said logs at mill to the parties to whom it is due, and in fact, if they deem it necessary, to control the business in every particular, to their own satisfaction."

The day of the month on which the contract was entered into is written in with a pen, and several interlineations are made with pen and ink. The paper itself clearly indicates that the first two pages were prepared as a completed contract before the addition of the third page.

Sutton and Weller were both sworn, and corroborate Connolly. Sutton testifies that he prepared the third page, and that the interlineations and erasures were made by him as a result of the conference; that the letters " E. S.," appearing in the margin opposite each interlineation or erasure, were written by him, and that all three sheets were attached before the paper was signed. Sutton was directed to prepare copies and file the instrument, and did so. He was then deputy clerk. The original was found in the clerk's office at the Sault, indorsed as follows:

" Received and filed June 24, 1884.
"E. S. B. SUTTON, Deputy Clerk."

A copy was sent by Sutton to Munising to be filed there. Such copy was produced, and indorsed thereon was Sutton's certificate, as deputy clerk, that it was a true copy, dated June 25, 1884. It was further indorsed as follows:

" Rec'd and filed this 1st day of July, 1884.
"THOS. NAHBENAYASH, Town Clerk."

Sullivan admits his signature, but accounts for it as follows:

"Well, I was to start with— He had been quarreling with the men a good deal, and discharged the tug captains there, and had quite a time; and he said to me: 'Half of these fellows, Tom, think those logs are yours; and I want you to make a contract to turn over those logs, a bill of sale, showing the real—' I was rafting the same day. We were rafting at the same time. And I told him: 'All right. Go and make out a contract.' Whatever it was, I told him to go and make it,—an agreement or contract, whatever it was; that I would sign it; and when I got back from the mill I signed it. I was in Mr. Sutton's office when I signed it. I went down to the mill. There was a little raft coming in, and I went down with the raft, and come down the other way, and come up the road. The mill was down half a mile or so. I came down into Mr. Sutton's office, and they were in there. * * *

"Q. What were the terms of the paper you signed?

"A. Oh, it was—the sense of it was—a bill of sale turning over the right of these logs to Mr. Connolly, or Ross & Co.

"Q. What kind of a looking piece of paper was it?

"A. It was just one sheet of paper. I do not remember whether it was type-written or in hand-writing."

On cross-examination he admits that Sutton, Weller, and Connolly were present when he signed the paper, and says that he could not tell how long he was at Sutton's office; that Connolly and he did not go to Sutton's office together; that he never signed more than one paper at Sutton's office.

"I was not present when he told Mr. Sutton what to put into it. I went down to the raft, and went down to the mill, half a mile down. I was not present at the time any direction was given in regard to it. I mean to be understood that at the time I came in, after I had been down to the mill, it had all been drawn up. I didn't hear any instructions given by anybody, or by Mr. Connolly, what to put into it. I didn't hear any instructions by Mr. Weller what to put into it, and I didn't give any myself as to what to put in it, and I do not know who did give the instructions what to put in it. I was not there.

"Q. Wasn't it read over to you?

"A. Well, I am not positive whether it was or not. It

was to be a bill of sale turning over the logs, and giving the rights to Ross. Mr. Connolly told me what it would be upon the dock.

"*Q.* You say you are not positive whether it was read over to you or not?

"*A.* No, I am not.

"*Q.* You want to stand on that answer.

"*A.* Yes, sir."

It is urged that this contract, giving Ross & Co. two-thirds of the margin, was a hard one; but Sullivan had been anxious to sell the logs at $8.50 per 1,000, or $6 for shipping culls, $12 for common, and $33 for uppers, but by this contract they were to be charged up to this venture at $6.50, $12.50, and $33.50, and Sullivan was to receive one-third of the profits over and above those figures. Sullivan endeavors to support his theory by instancing conduct on the part of Connolly which it is claimed is inconsistent with this written contract. In considering Connolly's conduct, it must be borne in mind that under all the agreements the title to these logs remained in Ross & Co.; that Ross & Co. were interested in them before they were rafted in the sum of $48,200,—nearly 60 per cent. of the value placed upon them by Sullivan. It must be remembered, also, that in the agreement of June 24, Ross & Co. expressly reserved the right to pay all moneys directly to the parties entitled thereto, and, if Ross & Co. deemed it necessary, they might assume control of the business in every particular. Although these provisions were not incorporated in the contract until June 24, it is evident that the original draft was prepared before any rafting or towing was done; and, if it be assumed that the contract was in existence, its provisions had evidently been talked over prior to its execution. In June, Connolly contracted for a tug at Detroit, in the name of Ross & Co. But Sullivan does not deny Connolly's statement that at Alpena, on

May 28, he was requested to assist in getting tugs for tow-
ing rafts to the Sault.     Weller went from Alpena to
Detroit, and was requested by Connolly to send up one or
more tugs.     Sullivan was unknown in Detroit.     Ross & Co.
were known, and had standing and credit.

The contract at Detroit was entered into by Weller for
Ross & Co.     Connolly's letter of June 22 to Laub, who was
foreman at the mill, directing him not to commence saw-
ing "until I see Sullivan," and that of June 23, instruct-
ing Laub not to put any more logs into the Seymour
boom "until we arrange about sawing them," so far from
ignoring Sullivan's voice in the matter, distinctly refer to
a conference with Sullivan before anything further was
done, and are perfectly consistent with pending negotia-
tions, Connolly's anxiety for some definite understanding
respecting the work about to be undertaken, and the exe-
cution of the contract on the day following.  · Connolly's
two letters to Ross & Co. were but a part of a correspon-
dence, all of which is not given.     They are not inconsistent
with negotiations culminating in the contract.     Just when
the difficulties between the tug captains and Connolly took
place, or when the conversations were had in which Con-
nolly insisted that Ross & Co. were owners, or when Con-
nolly engaged rooms at the Sault, does not appear.     It is
not inconsistent with the existence of the agreement or
with its contemplation that Connolly, after he had assumed
or contemplated control, should exercise that control, and
place himself in a position to direct affairs; that he should
direct or discharge tug captains, or employ or discharge
any person, even Sullivan himself, or refer to Sullivan as
foreman, pay out moneys to the persons entitled to them,
engage tugs, take rooms at the Sault, employ a book-
keeper, open an account with the business, and in disputes
with parties, who insisted that they were in Sullivan's

employ, assert a different management or proprietorship. Nor is it inconsistent with the contract that he should say to Collins, who wanted to buy the timber, that if he could make a profit Ross & Co. could. They had then an interest in the profits. Sullivan had had the management and swing until after the date of this contract. The tug captains regarded him as their employer, and they resented Connolly's interference. Connolly explains fully why he took the reins.

The first item of book-keeping in the "T. G. Sullivan Special Account" is under date of July 31, 1884, although one item, dated July 10, and two others, dated July 25, appear to have been brought into the account between May 28 and July 31. Aside from these items mentioned, over $12,000 had been disbursed, and is charged up, not in the special account, but in Sullivan's loan account for advances. On June 26, Connolly drew drafts upon Ross & Co.,—one in favor of "L. P. Trempe, tug Mystic," for $1,000; another, in favor of "S. B. Grummond, tug Swain," for $1,500; and another, of $400, in favor of George Kemp, for coal furnished tug Swain; and, on June 30, another in favor of George Kemp for $363.57. On June 30, Sullivan receipted to Ross & Co. for $3,263.57, the amount of the aforesaid drafts, specifying the drafts, to whom paid, and the purposes for which paid. On June 24, 1884, Sullivan receipted to Ross & Co. for $200, " as advances to pay men;" on July 5, for $65, " for sawing at Seymour's mill;" on July 7, for $1,377.02, "for labor, sawing (including P. M. Church's account of $111.33) and rafting logs;" and on July 8, for $282.20, "to pay men for watering and rafting logs." On July 9, Connolly drew on Ross & Co. for $749.43, in favor of tug Mystic, L. P. Trempe, owner; on July 12, a draft in favor of T. G. Sullivan for $245.33; on July 12, a draft in favor of S. B. Grummond for $1,960; on July 14, a draft in favor of

W. A. Burt & Co. for $242.45; and on July 21, a draft
in favor of T. G. Sullivan for $1,440.    Sullivan receipted
to Ross & Co. for the amount in each instance, except one,
when the draft was in favor of Sullivan, and in the receipt
the purpose for which the proceeds were used was specified.
On August 6 Connolly drew a draft in favor of Burt &
Co. for $1,500, and Sullivan receipted for the amount "to
pay labor at mill, rafting, towing, and other accounts con-
nected with *my business.*"  On August 11 Connolly draws
a draft in favor of Sullivan for $1,100, and Sullivan receipts
for the same "to pay sundry accounts connected with *my
business.*"    During September, October, and November,
1884, drafts aggregating over $10,600 are drawn in favor
of Sullivan and other parties on account of sawing lumber,
rafting, towing, wages, etc., and in each case Sullivan
receipts for the same.    The proceeds of these drafts may
have, in some instances, passed through Sullivan's hands,
but in most instances they were drawn in favor of other
parties, and no claim can be made that as to the latter
Sullivan's receipt as foreman was at all necessary for any
purpose.    A number of bills for towing, etc., were made out
to Sullivan.    In some instances these bills were O. K.'d by
Sullivan.    The only bill made against Ross & Co. is the
bill for the tug engaged at Detroit, under the contract
made by Weller.

On June 8, 1884, Sullivan writes Connolly as follows:

"Mr. McNeff has been to see the timber, and got back
to-day.    I don't know as I can make any bargain with
Him or not, yet.    He is a pretty close fellow.    But I think
I will make a bargain with McPhee, of Alpena.    He was
satisfied with the logs.    He says they are better than I
represented them to him.    He will let me know as quickly
as possible.    I was up to the landing, took up anchors and
chains and line, but there was too much ice to start to
work, so I came back here, and Finn and I concluded to
wait until the tug Swain comes up according to arrange-
ments you and I made.    She ought to be here to-morrow."

On August 11, 1884, Sullivan writes Connolly:

" In reference to conversation we had to-day as to insur-
ance of cargoes now loaded at dock for Detroit and San-
dusky, I wish to inform you that I do not wish you to
insure this lumber or any other that I may sell to be
delivered by vessel, without first having written instruc-
tions from me."

On August 20, 1884, Sullivan writes to Ross & Co., at
Quebec, as follows:

" I take the privilege of writing to you to see if you
would make a deduction on the stumpage of what pine I
have had from you, for I am paying too much for it per
thousand feet, as the quality of pine on those lands is not
good enough to command $2.50 per thousand at all. You
know it has been cleaned of all the cream timber for board
square timber, and taken very closely at that. The conse-
quence is, I have to suffer the loss. It is very shaky, and
that lowers the price awfully. I have put, at the lowest
calculation, $20,000 into the job, besides what money I
have had from you, $15,000 of which I have to pay yet
(the other was cash that I had saved before), besides my
own work for 15 months, and 30 teams' work. I got sup-
plies and rigging for to put in 10 millions, and the timber
did not hold out,—only less than 8 millions. Mr. Weller
represented the lands to cut 12 or 15 millions, and bound
me to put in 10 millions at least; and, of course, if the
timber had stood out, it would have helped me greatly to
have got in $2\frac{1}{2}$ millions more. Of course, in binding me
to put in 10 millions, he bound you to furnish it. I had
lots of supplies left to do it, and they lie on my hands
now. At the present price I am paying you for the stump-
age, I will have but very little left to pay my other debts,
and say nothing for myself; but I do not care for myself
so much. Now, I want you to make a deduction in the
stumpage of 50 cents per thousand feet, and that will be giv-
ing you more than any other man that understands lumber
would give last fall. * * * I talked to Mr. Connolly
and Mr. Weller about this, and cannot get any satisfaction.
Now, in reality they are liable to the law for not furnish-
ing me 10 millions of timber; but I do not want any law
at all, as I have never had a lawsuit in my life, and I hope
will not have any with you, as I hope probably to do a
good deal more business with you."

Sullivan now claims, however, that when this letter was written he had sold these very logs to Ross & Co. as 9,000,-000 feet at $9 per 1,000, and in the deal his indebtedness to Ross & Co. was entirely wiped out, and there was at that time a balance coming to him of between sixty and seventy thousand dollars. Further comment on this letter would seem to be unnecessary.

October 27, 1884, Sullivan executed to Ross & Co. a bill of sale of a large number of horses for the sum of $9,230. The bill recites that whereas said Sullivan—

"Has been unable to pay said indebtedness in full; * * * that it is further understood and agreed that the above sum, hereby paid by Ross & Co. to Sullivan for said above-mentioned property, is to be credited upon the amount owing by Sullivan to Ross & Co. under the indebtedness above mentioned, and secured by said chattel mortgage, and shall reduce the amount now due and owing under said secured indebtedness the full amount of the purchase price of said property above mentioned, to wit, the sum of $9,230."

In the fall of 1884, Sullivan goes to the woods, and writes Connolly from Grand Marais, sending him a list of horses and oxen sold by him to Weller and others, evidently covered by the chattel mortgages held by Ross & Co. He says:

"I will send those things to R. R. as quickly as possible, but Finn's harness I will send next stage. I did settle with H. Gamble just as he told you, and I had to use the money or starve, and I did not like to get that far down coming on winter; but I have not settled with any person else but the Swede. He settled $112 of his account with me by paying Louis Lamore for the fixing of sail-boat, and $35 board bill that was against us for our men's board; and the sail-boat is here, and if you want it you can have it; and that is the best I can do. I have not settled with James Reid yet for the towing of those logs, but will do it as quickly as possible. * * * I wish you would get my account settled up in full, and if you and Weller give me a deduction of 50c. on the thousand I would like very

much to have it done. Also do you know what Brady is paying for those yards in Detroit, or what he is doing with lumber?"

December 12, 1884, Sullivan writes Connolly, and says:

"I will write again to Reid to send me the charge against me for towing, and I will forward to you. * * * I would like to get a memorandum of my account in full to date, and also an account of my credits. You need not mind, you know, until you get those bills of Thurber and Randolph, and settled with Seymour at the Sault in full. Have you found out what Brady is paying for the use of the yard for lumber, and is it insured? I think it is not necessary to insure the lumber at Detour until coming on towards spring."

On May 20, 1885, Sullivan writes Connolly:

"Mr. Goddard, the man that bought from Randolph, has been here for a week, and has closed up the trade with Randolph. He is a member of the board of trade at Saginaw, and understands the present state of the lumber market, I think, thoroughly. He says he will do everything for me that he can to sell *my lumber* to the best advantage, and wanted me to send a man to Saginaw, to go with some of those buyers, and show them the lumber; so I came to the conclusion it was better to send Spencer down, and see if he could make a trade for it, as I think he can. He is a good man to talk up lumber, so I told him, if he finds men that want it, to telegraph you. Mr. Goddard says he knows now pretty well what the lumber is, on account of seeing the timber himself, and of course we having the pick of it. He says he thinks he can find me a buyer right away, and says I want to hold the lumber at Detour strong at $14 or better, straight. My instructions to Spencer are to sell straight measure, and no other way."

September 17, 1885, Sullivan writes to Connolly, desiring to repurchase some of the horses sold by bill of sale of October 27, 1884. He says:

"Why would it not be best to charge me with the horses at schedule price last fall, and let me pay for them as fast as I can, with interest? I wish to God that you would buy McDonald tract, and give me a chance, if you can, to

make something this winter, as I must do something this winter, if possible, to make a good deal of money; and the only way is to buy timber, and I will sell it to you. If you could only get me the timber, I can get backing, lots of it, to carry me along without any money from you at all, by giving them an interest with me."

In 1886 Sullivan had repurchased some of the horses covered by bill of sale aforementioned, and in February he gives Ross & Co. a draft on the Peninsular Land Company for $1,050, to pay for said horses. April 13, 1887, Sullivan borrows $500 from Ross & Co., and gives a mortgage to secure the amount, payable in two years.

A raft of lumber had, in September, 1884, gone over the rapids at the Sault, and such of the logs as were picked up were sawed at Detour. All of the lumber sawed at the Sault had been disposed of before the close of 1885, and the lumber at Detour was disposed of in 1887. On February 25, 1888, an account was rendered to Sullivan, showing a balance in favor of Ross & Co., of $23,564.43. October 2, 1888, Ross died. September 1, 1889, a statement of the account is again rendered. On October 1, 1889, Connolly writes Sullivan asking when he will pay. October 13, 1889, Sullivan writes Connolly the following letter·

"I got home Saturday, and found your letter in reference to Ross & Co. You can tell them, rather than have a lawsuit I will take $5,000; but as you know, in justice to me, they owe me a great deal more money. If this is not paid to me before long, I will have to take proceedings to collect what they in justice owe me, and I will get it."

Up to this time no claim had been made by Sullivan that he was not indebted to Ross & Co., or the estate.

Suppose it be conceded that there was sufficient in the circumstances immediately surrounding the execution of the writing of June 24 to warrant the submission of the question of misrepresentation, deception, or fraud in its

procurement to the jury in a proper case.  It is well settled that the victim of a fraud must be prompt in asserting it. The contract is dated June 24, 1884.  The first intimation given that this contract did not correctly represent the relations of the parties is contained in the letter of October 13, 1889, written nearly one year and eight months after a statement had been rendered showing all the expenditures in connection with the rafting and towing of the logs, the manufacture of the same into lumber, and the expenses and proceeds of all sales.  No attempt is made to explain the receipts given by Sullivan in the mean time, which cover expenditures amounting to tens of thousands of dollars; the payments made by Sullivan, amounting to nearly $10,000, to apply upon the very indebtedness which Sullivan now insists was canceled by the contract of June 1; the mortgage given to secure the loan of $500; the appeal to Ross & Co. to remit a portion of the stumpage charge; the payment of $1,050 for the horses; the sale by Sullivan of the mortgaged personal property, amounting to over $6,000, on account of Ross & Co.; the letter relating to the insurance of the lumber; the receipts given for money used "in my business;" the letters written after Sullivan had left the mill, relating to the lumber at Detour and Detroit, the towing bills, the sale of the lumber, and the appropriation of the proceeds of other sales.  This testimony does not rest in parol, but is in writing, over the signature of Sullivan himself.  These instruments, with which this record abounds, are absolutely inexplicable upon the theory which Sullivan now advances, but are entirely consistent with the only other theory advanced in the case, viz., the existence of the contract in question.  These documents are referable only to the contract of June 24. That contract furnished the only key to their solution. There is no middle ground.  Plaintiff must be deemed by these writings, covering a period of three years, to have

admitted the existence of this contract, and acted upon it, and cannot be permitted, after the lapse of five years and four months, to raise the question of fraud in its procurement.

This contract was signed in the presence of two witnesses. No claim is made that at the time of its execution it was not read, or that it was not correctly read, or that any artifice was there employed to secure Sullivan's signature thereto, or that it was there stated that it was a mere bill of sale, or that it was there represented to be a paper other than what it purports to be. Sullivan's only claim is that before its execution Connolly told him that he wanted a bill of sale, and went to have it prepared; and it is alleged that the inference to be drawn is that he relied upon Connolly's statements, made before its preparation, and signed the paper, supposing it to be a bill of sale merely. As is said in *Campau v. Lafferty,* 50 Mich. 114, 117: "No man could rely upon even the most solemn written instruments," if, upon such evidence, a contract may be disregarded. It would only be necessary in any case, although all the precautions as to the publicity of execution and signature of witnesses be observed, for the party seeking to avoid a contract to assert that before the contract was prepared the other party informed him that another and different contract was to be prepared. Instead of attempting to vary the terms of a written instrument by parol, it would only be necessary in any case to set up prior conversations as constituting the contract, and brush aside the written instrument with the unsupported allegation that the party seeking to avoid that contract supposed that the contract which he signed was that previously agreed upon. Weight must always be given to the fact of execution; and the presumption which exists in favor of written instruments, not unconscionable in their character, but mutually advantageous in their provisions, executed by

parties competent to contract, and between whom no fiduciary relations exist, in the presence of witnesses who affix their signatures as such, cannot be overcome except upon testimony from which an inference of duress, deception, misrepresentation, substitution, or artifice is clearly deducible.   *Campau v. Lafferty, supra; Houghton v. Ross,* 54 Mich. 336; *Tayor v. Fleckenstein,* 30 Fed. Rep. 99.   It is true that one witness testifies that Connolly, before the execution of the contract of June 24, told him that Ross & Co. had purchased the logs, and another that in October, 1884, Connolly repeated the statement to him.   Connolly denies that he made either statement.   Suppose, however, that he made either or both.   They were made to third parties.   Sullivan was not misled by them.   They bear upon the probabilities of the execution of the* contract, and the credit to be given to Connolly's testimony. Neither the execution of the contract nor the admissions of plaintiff depend in any measure upon Connolly's testimony.

There is a well-settled rule adopted by courts of equity in actions brought for the specific performance of contracts for the sale of land, which it seems to us is equally applicable to actions at law founded upon contract, viz., that a party setting up part performance to take a parol agreement out of the statute of frauds must show acts unequivocally referring to and resulting from *that* agreement, and done with a direct view to its performance.   In other words, part performance must be shown by acts that confirm the existence of the contract.   *Ramsdell v. Millerd,* Harr. Ch. 373; *McMurtrie v. Bennette,* Id. 124.   In the latter case the court say:   "The agreement set up must appear to be the *same* with the one partly performed. There must be no equivocation or uncertainty in the case." In the present case the contract upon which plaintiff relies rests in parol.   This documentary evidence, and all the

writings that passed between the parties, excluding from consideration the contract of June 24, so far from indicating the existence of the agreement set up by plaintiff, are wholly inconsistent therewith, and unmistakably show that the things done and relied upon to take the agreement out of the statute refer to, result from, and must have been done with a view to the performance of, some agreement other than that relied upon, by plaintiff. Two contracts, however, are set up. Suppose that both rested in parol. Can there be any doubt as to which this documentary evidence refers to? The object of the statute under consideration must be considered, and the obvious duty of the Court is to treat this mass of unexplained documentary evidence as conclusive. A proper regard for the purpose of the statute will not permit a party to avail himself, as part performance, of acts done which, by numerous voluntary writings, he has related to another and different contract.

The judgment is therefore reversed, and a new trial ordered.

The other Justices concurred.