## SULLIVAN *v.* ROSS' ESTATE.

1. LOGS AND LOGGING—CONTRACTS—NEGLIGENCE.

> Where a party assumes exclusive control of the rafting and towing of logs in which he has an interest, under a contract with the other party in interest giving him the right, if he should deem it necessary, "to control the business in every particular to his own satisfaction," he is liable to the other for damages resulting from his failure to use ordinary skill and prudence in handling the logs.

2. SAME—SCALE—MISTAKE—QUESTION FOR JURY.

> Evidence that both long and short logs were hauled to a certain landing, and that a purported scale of the logs at the landing was headed "Scale of Short Logs," was sufficient to go to the jury in support of a claim of mistake in the scale.

3. SAME—ESTOPPEL TO DISPUTE SCALE.

> That the vendee in a logging contract received the scaler's statement, and reported it to the vendor as the basis of a charge for stumpage, does not estop him from afterwards questioning the correctness of the scale, in support of a claim against the vendor for negligently causing the loss of part of the logs, where it appears that he suggested to the vendor that the scale was too low, and asked him to require a new scale.

GRANT, J., dissenting.

Error to Marquette; Stone, J.   Submitted January 4, 1900.   Decided May 29, 1900.

Thomas G. Sullivan presented a claim against the estate of James G. Ross, deceased. The claim was disallowed by the probate judge, and claimant appealed to the circuit court. From a judgment there for claimant, defendant brings error. Affirmed.

*Clark & Pearl* (*John D. Conely*, of counsel), for appellant.

*Moore & Moore* (*Ball & Ball* and *T. E. Tarsney*, of counsel), for appellee.

HOOKER, J. Sullivan filed a claim against the estate of Ross in probate court for $100,000. It was in form a petition, setting up the facts relied upon to establish his claim, which were in substance the following, viz.: Ross owned pine lands in Michigan. On November 7, 1883, a contract was made between him, under the name of Ross & Co., and Sullivan, wherein it was agreed "to sell all the pine [thereon] to Sullivan for one dollar and fifty cents per thousand feet, board measure," which Sullivan agreed to pay, and to cut the timber before May 1, 1884. The contract contained the following provision:

"It is hereby agreed that said second party shall have the right to cut said timber as above mentioned before he shall pay the price above mentioned, and also the right to remove the same to the landings or rollways on the shore of Lake Superior; but said property shall continue to be the timber of Ross & Company until paid for by said second party according to the amounts above mentioned, and said second party shall not be permitted or have authority to remove said logs so manufactured from said landings or rollways without paying for the same the sums as above mentioned."

Another contract was made December 18, 1883, between the same parties, which provided in substance:

"That whereas, the said second party is desirous of procuring advances from said first party for the purpose of enabling the said second party to carry on the work upon the lands mentioned in the articles of agreement made

between the said parties the 7th day of November, A. D. 1883, being an agreement for the sale of pine stumpage mentioned in said agreement of November 7th, 1883, reference to which agreement is hereby made; said advances desired by second party being as follows: To pay amount due William A. Burt, St. Ignace, $4,100; to pay amount of draft drawn by second party on the first parties in favor of L. P. Trempe, due December 26th, 1883, $2,355; to pay the amount of Brady & Company bill, $788.45; to amount to pay men now and in the following spring as required, for work now done and to be done during the present winter, ten thousand dollars ($10,000),—the total amount of said advances being seventeen thousand two hundred and forty-three and 45-100 dollars ($17,243.45): It is hereby understood and agreed that, so far as said first parties shall make said advances, they shall have a lien on all the timber cut and standing which shall have been purchased by said second party from said first parties under and by virtue of said agreement dated November 7th, 1883, above referred to; and said second party agrees to pay said first parties for so much of said advances as said first parties shall make to said second party before said timber shall be removed from the rollways upon the banks of Lake Superior, it being hereby agreed by said parties that said timber shall continue to be the property of said first parties until not only the stumpage for the same shall be paid as mentioned in said agreement of November 7th, 1883, but until the amounts of said advances as shall be made by said first parties to said second party shall be fully paid; said advances to be paid by June 1st, 1884. It is understood and agreed between said parties that said second party shall pay to said first parties seven per cent. interest upon all advances that shall be made from the date of each advance. Said second party is also to pay to said first parties a commission fee upon said transaction equal to the amount of five per cent. of such advances as shall be made."

Claimant got out 9,000,000 feet of logs on the bank of Lake Superior previous to May 28, 1884. On June 24, 1884, a third contract was made between the parties, reading as follows:

"That whereas, the said party of the first part has been unable to pay up for the advances made to him by the

second party under certain agreements dated November 7th, 1883, and December 18th, 1883, and also for stumpage due said second party for timber cut under said last-mentioned agreement; and whereas, said first party is desirous of moving said logs to Sault Ste. Marie, where he hopes that a sale can more readily be made of the same, or where the same can be cut into merchantable lumber; and whereas, said first party desires to obtain from said second party further advances to enable him to remove said logs to Sault Ste. Marie, in Chippewa county, Michigan, or any other place in Michigan that said Ross & Co. may direct, and to the mill of H. W. Seymour: It is hereby agreed by and between said first and second parties as an agreement supplemental to said previous agreements, but not in any way affecting or changing them, that said second party will advance to said first party at the rate of one dollar per thousand feet, board measure, for the purpose of towing and delivering said logs at said place or places that Ross & Co. may direct, and will also advance at the rate of two dollars and a half per thousand feet, board measure, for the purpose of paying for the sawing of any or all of said logs, if it shall appear to be necessary to saw said logs in order that they may meet with a more ready and satisfactory sale.

"In consideration of said additional advances so agreed to be made, it is understood and agreed that said second party shall have the same right to the said logs, and the lumber when cut out of the same, as he now holds under and by virtue of said agreements of November 7th and December 18th, 1883, to the extent of the advances and stumpage so previously made under said previous agreements, and also to the extent of the said new advances for towing and sawing as above stated.

"It is further understood that, in consideration of said new advances, there shall be paid to said second party from the sale of said logs or lumber manufactured from the same, first, the advances which have already been made and interests and commissions upon the same, and also the amount due for stumpage as agreed upon in said previous agreements, and also for the advances made for towing and sawing and commissions and interests upon the same; and after the same shall be fully paid to said second party, if there shall remain any balance or profit over and above the same, said profit shall be divided between the said first and second parties, one-third of the same to belong to said Sullivan, first party, and the remaining two-thirds to said

Ross & Co., second party. It is understood and agreed that the removal of said logs shall be at the risk and expense of said first party.

"The basis of the division of the profits shall be based upon the prices mentioned in a contract drawn, but not entered into between the parties hereto, and now in the hands of F. O. Clark, of Marquette, except as to mill culls, and as to those they shall be equally divided between the parties hereto. Basis of value of Norway pine to be $6.00 for long and $4.50 for short logs, and profits to be divided as above stated.

"And it is mutually agreed by and between the parties hereto that Ross & Co., of the second part, shall have the right to pay all the moneys mentioned in this agreement as a further advance for towing and cutting said logs at mill to the parties to whom it is due, and in fact, if they deem it necessary, to control the business in every particular to their own satisfaction."

The indebtedness mentioned in the last contract was $48,000. Ross took possession and disposed of the logs, claiming to act under the contracts, and attempted to raft them from Au Sable Point, on Lake Superior, to Sault Ste. Marie. Through the negligence and recklessness of the agents of Ross in providing and keeping closed a proper boom where the logs were rolled into the lake at Au Sable Point, about 2,000,000 feet of the logs were blown across the lake, and lost. Of the logs which reached and were sent down the rapids of the St. Mary's river, half a million feet were lost, and a large expense was incurred by Ross in saving a million feet which escaped from his boom below the rapids through his negligence and recklessness. Several million feet were sawed into lumber, and Ross permitted this to be negligently and recklessly done, whereby the product was injured and lessened, resulting in a loss of $30,000. Ross shipped this lumber to Detroit, and sold it from there. This was in violation of the contract, and occasioned a loss of $50,000. Ross received $60,000 from the logs, for which petitioner asks an accounting. Several other items were included in the claim, which need not be discussed,

as we understand that they are not relied upon. The claim was disallowed in probate court, but upon appeal claimant obtained a verdict for $95,525.65. The cause is before us on a writ of error. The claim for losses through taking the lumber to Detroit was withdrawn from the jury.

One of the most important questions raised by defendant's counsel relates to the proper construction of the contract of June 24th. They claim that the last clause of that writing gave defendant the right to take the control and management of the business, and that he might manage it according to his own judgment, without liability for mistakes or failures, if there was no bad faith. The court instructed the jury that Sullivan was to assume all ordinary risks, such as the risks of navigation, winds, and calamities that might come, but that he was not responsible for the negligent acts, if any, of Mr. Ross or his agents, and that the estate was liable to him for damages resulting from the want of ordinary care and prudence in the conduct of the business. Counsel for the defendant cite a number of cases which hold that, when a vendee agrees to purchase an article if satisfactory, he is not liable if he reject it, so long as he is honest in the expression of his dissatisfaction. Several of the cases are from this court.[1] No case is cited that raises just such a question as we have before us, and we infer that it is useless to search for that which the industry of counsel has failed to find. We think the cases cited are distinguishable from this in principle. In those cases the parties may be supposed to have understood that the purchaser was to exercise his right to reject the goods if for any reason, no matter how frivolous, he should be dissatisfied with them. So, in this case, the defendant's right to assume control did not depend upon his ability to give a reason for so

[1] Viz.: *Gibson* v. *Cranage*, 39 Mich. 49; *Pierce* v. *Cooley*, 56 Mich. 552 (23 N. W. 310); *Mansfield Machine Works* v. *Common Council of Lowell*, 62 Mich. 546 (29 N. W. 105), *Plano Manfg. Co.* v. *Ellis*, 68 Mich. 101 (35 N. W. 841); *Platt* v. *Broderick*, 70 Mich. 577 (38 N. W. 579); *U. S. Electric Fire-Alarm Co.* v. *City of Big Rapids*, 78 Mich. 67 (43 N. W. 1030).

doing that should be satisfactory to others; but it would not be reasonable to believe that either party contemplated a negligent or reckless course in rafting the logs or manufacturing them into lumber. We think the term used should be subject to the general limitation that, if Ross should choose to take control, he would use ordinary skill and prudence in handling the property, in which the parties had a mutual interest. It is a rule applicable to contracts generally, when a contrary intent does not affirmatively appear, that ordinary skill and prudence are contracted for, and we cannot doubt that such was the intention of the parties in this instance.

Counsel for the defendant insist that there is no evidence that Connolly did take control, and raise the question upon the introduction of evidence whether some testimony offered to prove it was admissible, contending that it was as consistent with the claim that Sullivan was managing the business. We are of the opinion that there was evidence tending to show that Connolly did take control to the exclusion of Sullivan, and therefore it was a question for the jury.

We think, also, that the question of negligence was for the jury, and that there was testimony offered tending to prove it upon all of the claims.

It is urged that the claimant has made claim to a greater quantity of logs than Connolly received from him, and that the jury should have been instructed that 7,500-000 feet, in round numbers, was the limit. It is contended that, had this been done, there could have been no balance in claimant's favor; and it is obvious that it would have materially reduced his claim, to say the least. This is based on two propositions:

1. That the parties agreed upon Spencer and Barrett to scale the logs, and must be bound by their scale.

2. That the letters of Sullivan to the defendant estop him (Sullivan) to claim more than such quantity.

The court instructed the jury that the parties agreed upon Spencer and Barrett as scalers, and that they made

a scale of 7,500,000 feet approximately, and that this should be binding upon the parties, unless there were fraud or mistake. No one claims any fraud upon defendant's part in relation to the scale. Claimant insists, however, that there was a mistake in the aggregate amounting to a million and a half feet. The undisputed testimony shows that Spencer and Barrett were employed by Sullivan as scalers, by consent of Connolly, and that each measured a portion of the logs. So we think the court was justified in saying to the jury that the parties agreed upon them as scalers, and that their scale should be final, unless there were fraud or mistake shown. The alleged mistake is that Mr. Barrett did not report his full scale, or, if he did, it was not included in the computation. There was evidence tending to show that the logs were banked at two landings, and at each some were long and some were short logs. The claim is that Barrett scaled at one and Spencer at the other, and that their scales were added together, making 7,500,000 feet. The item from Barrett was headed "Scale of Short Logs," and it was maintained that the long logs, if scaled, were not included in the aggregate. This claim rests on the statement of some witnesses that there were long logs at both landings, and on the fact that Barrett's scale referred to "short logs." Barrett testified that this was his total scale, and that he scaled all on the landing. He said: "It ran small logs,—seven or eight to the thousand. * * * I didn't scale only short logs, and I think all drawed in at that end of the landing." He said further: "I don't remember whether any long logs were drawn down that road or not; not to my knowledge, because I scaled what was down that way." He was repeatedly asked about this, and reiterated, when asked if he would say there were no long logs at Finn's camp, that he remembered none, but that, if there were, they did not come to where he scaled. We think that Mr. Barrett's evidence is pointedly to the effect that he scaled all of the logs at that landing, and that it was included in the item mentioned. The right to go to the

jury with this question, then, rests upon the statement of witnesses that long logs were hauled to that landing, and the presence of the word "short" in the Barrett scale. Upon the strength of this, Sullivan was allowed to put his estimate upon the pile of logs, to the exclusion of the scale, and the jury were permitted to find that a million and a half more logs were upon the bank than the scale showed. In addition to the fact that a formal scale was made, it was given by the scalers to Sullivan, and by him reported to defendant, who seems to have relied upon it. It was made the basis for the charge for stumpage without dissent, and, although Sullivan must have known of his estimate of 9,000,000 feet, he seems not to have mentioned it to Connolly before the logs were rafted. According to Connolly, however, he did suggest to him that the scale was too low, and asked him to require a new scale, when there was talk of a sale to Collins, shortly before the logs were taken to the Soo. Counsel also claim that the fact is proved by the aggregate of logs lost, lumber destroyed, and sales. Thus they say there were:

| | | |
|---|---|---|
| Logs lost on Lake Superior | 2,000,000 | ft. |
| Logs lost at Soo Rapids | 500,000 | " |
| Lumber destroyed by bad sawing | 300,000 | " |
| Lumber produced | 6,745,525 | " |
| Logs sold | 623,500 | " |
| Total | 10,169,025 | " |

We are of the opinion that the claim that there was an estoppel is not tenable, and that the learned circuit judge did not err in leaving the question of mistake to the jury.

Several assignments of error fall with this determination. Thus it was not error to show by Spencer another scale, and by Sullivan and others their estimates of the quantity of logs.

Counsel for the defendant claim that the verdict of the jury was excessive: (1) Because, while charged with interest from 1884, the defendant was not allowed interest on advances; (2) because, being entitled to but one-third

of the profits above advances and expenses, the claimant should be allowed to recover but one-third of the losses resulting from defendant's negligence.    The first of these two claims is erroneous, for the reason that the account shows that an item of $11,108.88 is included in the account for interest on advances.    The second proposition rests upon the assumption that, under the contract of June 24th, the stumpage and advances were to be deducted from the proceeds of the logs, and that the remainder was to constitute profits, of which defendant should have two-thirds. This ignores the provision referring to the unsigned contract as a basis of profit, which shows that no profits could arise until the specified value of the lumber should have been received, and not then unless it equaled the advances, stumpage, etc.    Hence there may have been a margin between the amount of the advances and expenses and the value of the logs, computed at $9 per 1,000 feet, and, as this margin would belong to the claimant, he would be entitled to recover, if lost through defendant's fault.    It is obvious that the proposition that claimant ought not to recover more than one-third of the lost profits as defined by the contract is correct.

We have endeavored to examine carefully every point made in this cause, though we do not consider a discussion of each question necessary.    We find no error, and the judgment is affirmed.

MONTGOMERY, C. J., MOORE and LONG, JJ., concurred with HOOKER, J.

GRANT, J. (*dissenting*).    The facts connected with this litigation have been so fully stated in the previous decisions of this court that it is unnecessary to restate them here.    *Sullivan* v. *Ross' Estate*, 98 Mich. 570, 113 Mich. 311, 315 (57 N. W. 821, 71 N. W. 634, 76 N. W. 309).    McGRATH, C. J., made a careful and thorough statement of the facts.    There is no substantial difference between this record and that then before us.

1. The first question arises upon the construction to be placed upon the following language of the contract:

"And it is mutually agreed by and between the parties hereto that Ross & Co., of the second part, shall have the right to pay all the moneys mentioned in this agreement as a further advance for towing and cutting said logs at mill to the parties to whom it is due, and in fact, if they deem it necessary, to control the business in every particular to their own satisfaction."

Parties are presumed to mean something by the language which they deliberately place in their contracts. Under the construction claimed by plaintiff, the authority granted "to control the business in every particular to their own satisfaction" has no meaning whatever. Defendant's obligation is precisely the same with the language out as with it in. I do not think plain language can thus be read out of a contract. It is conceded that, where one buys property to keep if it is satisfactory to him, he may reject the property if for any reason it is not satisfactory to him. In chattel mortgages the mortgagees may seize the property under similar language. "We know of no reason of public policy which prevents parties from contracting that the decision of one or the other shall be conclusive." *Campbell Printing-Press Co.* v. *Thorp*, 36 Fed. 414. This is a concise statement of the rule by Justice Brown. What difference does it make whether it is a machine to be sold or work to be done? If Ross had agreed to sell, cut, haul, raft, and manufacture this timber for Sullivan to his (Sullivan's) satisfaction, could Sullivan have been compelled to accept it? If Sullivan had agreed to do the work for Ross to Ross' satisfaction, could Ross have been compelled to accept it? If they had agreed that the work should be done to the satisfaction of some third person, would not his satisfaction with the work have been conclusive upon them? Could Sullivan have sued Ross for damages after the determination of this third person, although he had protested against the method adopted and Ross had favored it? The only

ground for recovery, under these circumstances, would be the *quantum meruit*, and not the contract.

What is the situation? Sullivan was hopelessly bankrupt. He owed Ross $48,000 for the timber and the advances. Sullivan could not pay, or sell the timber, or procure any one else to advance the money to relieve the property from Ross' security. If the property were lost, the loss would fall upon Ross, because Sullivan was irresponsible. Sullivan was to perform the work at his own risk and expense, Ross advancing the money therefor. It was at least as much to the benefit of Ross as to that of Sullivan to have the work properly done. It was entirely natural that Ross should contract to take the work out of Sullivan's hands if he were not satisfied, and then perform it to his own satisfaction. If he did so, under all the authorities he cannot be held unless he acted *mala fide*. It was to his interest to act in good faith, and there was no motive for his acting to the contrary. Whatever loss there was arose from error of judgment. The judgment of the jury as to whether the work was properly done was substituted for that provided for in the contract. Sullivan thought it was not safe to prepare the raft on the shore of Lake Superior as it was done. Ross thought it was. Ross' method would have been proper but for the wind that came up and carried the logs out into the lake, and the jury were permitted to say that this was negligence. So, in catching the logs that were sent over the falls of the Sault Ste. Marie river, Sullivan thought two tugs, one at each end, were required. Ross thought that, if one end was attached to the shore, one tug would be sufficient. It was simply an error of judgment. Yet the jury were permitted to say that this was negligence. It is common knowledge that millions of feet of logs are caught and held in rivers by booms attached to each shore. *Hall* v. *Boom Co.*, 51 Mich. 377 (16 N. W. 770). In that case 33 miles of logs were caught and held by such a boom during the spring freshets. Two rafts were taken over the rapids on the same day, with the same booms, the same

tug, and the same outfit, with plaintiff in charge. Con-
nolly's judgment was good as to the first raft, for the
booms were sufficient, and all the logs were saved.
Whether any logs had been sent over before, I do not
find stated in the record. It was the latter raft that
broke. Plaintiff testified, "I don't know of any reason
why the boom broke at night and did not in the morn-
ing." The same argument will apply to the sawing at
Seymour's mill. Did not Ross have the legal right to say
to Sullivan: "If I deem it to my interest to take hold of
this work and do it, I shall have the privilege of doing it
to my own satisfaction. Neither will I consent to leave it
to a jury to determine whether it is properly done." The
result of the joint venture was that Sullivan lost his labor
and some property. Ross lost his lumber and $23,000
besides; and now, because of these alleged errors in judg-
ment, he is compelled to pay $95,000 more, entailing a
loss upon him of $118,000. I think the record does not
justify the conclusion reached by the jury. There is no
claim that Connolly acted differently than he would if he
or Ross had been the sole owner of the property. The
question of *mala fides* is, therefore, not in the case.

2. Upon the first trial, Sullivan swore positively to a con-
tract of sale of 9,000,000 feet to Ross at $9 per 1,000, and
that he had been employed by Ross at $100 per month to
superintend the rafting. In this he was corroborated by
Spencer, the scaler, who is also a creditor of Sullivan, and
by two others, who swore positively that Connolly, Ross'
agent, told them that Ross had purchased the logs. Not-
withstanding this positive testimony, this court did not
hesitate to hold, in a unanimous opinion, that it was not
true, and that the contract of June 24th, the written doc-
uments, and the conduct of Sullivan, stamped this testi-
mony as false. This same written evidence, consisting
of letters, telegrams, bills rendered, and drafts drawn, is,
in my judgment, equally as conclusive against the present
claim of Sullivan that Ross had assumed entire control of
the business and was responsible for all that was done. I

call attention to the letter written by Sullivan to Connolly August 11, 1884, and found at the top of page 581, 98 Mich. That letter is wholly inconsistent with the idea that Ross, through Connolly, was in the exclusive control and management of the business. See, also, pages 584, 585. I further call attention to the fact that Sullivan testified that Connolly took entire charge of the business after June 1st. His testimony upon this point is as follows:

"*Q.* Up to the time you got the logs banked, who managed the business?

"*A.* I managed the business, and paid the men. I got part of the money from Ross. After the first of June, Mr. Connolly had charge. He paid the men. The lumber was sold in Ross & Co.'s name."

This testimony is flatly contradicted by the contract made 24 days after, as he testified, Connolly had taken absolute charge and control, and as well by his subsequent conduct, letters, etc. Forty-four pages of the record contain the written documents, which are entirely inconsistent with Sullivan's present claim. They show conclusively that he had not abandoned the control of the business, but was still managing it. The parol testimony in this case is no stronger against these documents than it was against those upon the first trial. If we were right then,—and there is no claim that we were not,—we must now, in my judgment, hold that Sullivan is estopped to make his present claim.

3. The scales made by Spencer and Barrett should be held conclusive. They were the scalers agreed upon by the parties. Counsel for the plaintiff assert, "The pretended scale of 7,511,077 feet is a fraud." They do not, however, assail the competency or honesty of either Spencer, plaintiff's own witness, or of Barrett. Counsel concede the accuracy of Spencer's scale at Davidson's Landing. The trouble, therefore, if any, is with Barrett's scale at the other landing; and counsel assert that 1,500,-000 feet of long logs were omitted by Barrett from his scale. Unless they can make good this assertion, plaintiff

cannot recover. Barrett swears that he scaled all the logs that were hauled at that landing, and he reported the amount as 2,566,410 feet. His testimony upon this point is as follows: "I scaled all on the landing. I scaled there as the logs were hauled from Finn's camp." A strenuous effort was made by counsel for plaintiff, on cross-examination, to impeach Barrett's testimony, but, in my judgment, it utterly failed. If Barrett scaled 1,500,000 feet of. long logs, it is impossible that he should have forgotten it. No such claim was made for years. Sullivan reported the total of Barrett's scale to Connolly as above given. There was no evidence of fraud on the part of Barrett, and the court should have so instructed the jury. In order to show a mistake, it was incumbent upon Sullivan to prove that long logs were hauled where Barrett scaled, and that he either scaled them, and the scale was lost, or that he neglected to scale them. Upon no other ground can he attack the scale. Spencer's testimony that he scaled all the timber upon the skids in the woods during the fall and winter before was not binding upon the defendant, and could not impeach the scale of Spencer or the scale of Barrett, until fraud or mistake was shown. Spencer testified that he did make such a scale, but did not know what had become of it, and that it was "something better than 9,000,000 feet." Defendant, or his agent, Connolly, knew nothing about this scale, and it is not of itself substantive evidence that Barrett had made a mistake. 'If a mistake had been shown, it might then be competent for the purpose of showing the actual amount. If any long logs were hauled to the landing where Barrett scaled, there is no tangible evidence to show the amount. Not a person testifies that he hauled any long logs to this landing. Certainly Sullivan could have produced witnesses who were in his employ to testify, if it were the fact. All parties for years acted upon the correctness of the Spencer and Barrett scales. They were reported to Ross as the total amount. On August 20, 1884,—more than four months afterwards,—Sullivan wrote to Ross at Quebec,

complaining that the logs were short of the representation made by his agent Weller; that they held out less than 8,000,000 feet, were shaky; and asked for a rebate of 50 cents per 1,000 stumpage. Both Sullivan and Spencer reported the amount of this scale to Collins & Johnson, who wrote to Ross, making a proposition for purchase, and stating the exact amount of logs according to these scales. They ought not now, in my judgment, to be permitted to question their correctness upon the unreliable testimony in this record. *Malone* v. *Gates*, 87 Mich. 332 (49 N. W. 638); *Eakright* v. *Torrent*, 105 Mich. 294 (63 N. W. 293).

The court instructed the jury that, if these scalers "did not proceed and scale all, and did not exercise their judgment upon it, or committed errors, such scale would not be binding." This instruction was erroneous for the reason that no attack was made upon Spencer's scale, and the jury should have been instructed that it was conclusive; it is erroneous because there was no evidence that these scalers did not exercise their honest judgment; and, as I have already stated, I do not think there was any competent proof that they did not scale all. It is significant that the logs sold under the contract of June 24th amounted to within 142,052 feet of the amount of the Spencer and Barrett scale. The lands from which this lumber was taken had been cut over before, and the best lumber taken. The logs that were driven off the shore of Lake Superior were soon driven back upon the shore by a contrary wind, and all that could be found were picked up. The same is true of the logs that floated down the Soo river. That some were lost is undoubtedly true, but how many is a matter of guesswork.

4. Sullivan was permitted to testify that he looked over these logs from time to time as they were banked upon the shore of the lake, and that, in his judgment, there were over 9,000,000 feet according to the Scribner rule. He made no scale himself of any portion of the logs. He testified that the landing was about a mile or a mile and a

quarter long; that they were banked on very high ground, —40 to 60 feet high,—whence they were rolled down to the level of the water.  The same witness testified that he saw the lumber that was sawed, and, when asked if he was able to judge how much there was, replied: " I can't remember.  It is pretty hard to guess any amount of lumber in that manner in a big bulk, or in different bulks." Is it any easier to guess the amount of lumber in logs rolled along the shore in different bulks than it is to guess at lumber sawed and piled?  Scalers had been agreed upon satisfactory to both parties, whose scales Sullivan does not claim were dishonestly made.  There was no occasion for his examining with a view to forming a judgment.  Is such a statement of any value?  It is, in my judgment, the baldest guesswork, and wholly unreliable; and it is upon such testimony as this that the jury were permitted to find that there were over 2,000,000 feet more than the agreed scales made.  I think this testimony was utterly incompetent, and should have been excluded.

Judgment should be reversed, and no new trial ordered.