NESTER et al. v. DIAMOND MATCH CO. (two cases).

RIEDINGER v. SAME.

(Circuit Court of Appeals, Sixth Circuit. December 4, 1900.)

Nos. 801–803.

**1. LOGS AND LOGGING—OBSTRUCTION OF STREAM—RIGHT OF PRIVATE ACTION.**
    A private action cannot be maintained to recover damages for the unlawful obstruction of a river by log booms constructed near its mouth by defendant for its own use in connection with its mills, and which stopped the passage of all logs floated down the river, where plaintiffs never made or attempted to make any use of the stream with which such obstructions interfered.

**2. SAME.**
    Plaintiffs during a number of years placed logs in a stream, and allowed them to float down, mingled with those of other owners, until they were stopped by booms constructed near the mouth of the river by defendant for its own private use. The defendant passed the plaintiffs' logs through, sorted them, and placed them in side booms, from which plaintiffs took them. Some structure was necessary to prevent all the logs from floating out into Lake Superior and becoming lost, and plaintiffs never made any arrangement to handle their own logs until after they had been passed through defendant's gates and reached the mouth of the river. *Held* that, by voluntarily making use of the booms of defendant, they waived any right to recover damages upon the ground that such booms constituted an unlawful obstruction of the stream; nor could such an action be maintained because plaintiffs' logs suffered injury by reason of the unreasonable delay of defendant in passing them through its gates, the action being in tort, and not upon contract, implied or express.

In Error to the Circuit Court of the United States for the Western District of Michigan.

This is an action in tort to recover damages alleged to have been sustained by reason of an alleged unlawful obstruction maintained in the Ontonagon river, a navigable stream, wholly within the state of Michigan, which flows into Lake Superior. The declaration contained several counts, and, in substance, alleges that in the years 1890 to 1897, both inclusive, the plaintiffs placed in said river large quantities of pine saw logs for the purpose of running through and upon the waters of said river, and rafting and towing them from the mouth of said river, upon the waters of Lake Superior, to their mills at Barega; that the defendant, a corporation of the state of Illinois, was likewise engaged in the business of lumbering upon said river, and had mills erected and in operation at and near the mouth of said river, and "that the defendant wrongfully and unlawfully caused to be put, placed, and maintained in said Ontonagon river divers obstructions to the navigation thereof, to wit, columns of piles, jam piers, booms, logs, stones, timbers, and other hindrances, for the purpose and with the design of hindering, delaying, and obstructing the free and natural navigation on said Ontonagon river, and of hindering, preventing, and obstructing the plaintiffs in the navigation thereof, and from running, driving, floating, and rafting the said pine logs of the said plaintiffs upon and through said Ontonagon river aforesaid, by means whereof the navigation of said river by the plaintiffs was impeded, hindered, and obstructed, * * * and delayed in the running, driving, rafting, and manufacture of their said saw logs for long spaces of time"; that said logs, by reason of such delay and obstruction, were held back in the river, and "became sap-rotten, worm-eaten, discolored, and otherwise greatly injured and damaged," whereby damage had been sustained to the extent of $150,000. The defendant pleaded the general issue of not guilty. To maintain the issue upon their part the plaintiffs gave evidence tending to show that prior to May, 1890, Thomas Nester, the husband of the plaintiff Margaret Nester, and the father of the other plaintiffs, was the owner of large bodies of pine lands and of logs and lumbering equipment, and was engaged in lumbering upon the Ontonagon river and its tributaries, and of driving saw logs cut from his lands down the Ontonagon to its mouth, where the lumber was made into rafts and towed to his saw mills; that upon the death of said Thomas Nester, May 12, 1890, the plaintiffs succeeded to his business, and between May 12, 1890, and the bringing of this suit in January, 1898, they had cut, hauled, and put in said river logs aggregating 160,000,000 feet; that in 1882 the defendant purchased from Rich Bros. their saw mills and lumbering outfit on the Ontonagon river, and from that time had conducted large lumbering operations on said river and its tributaries, and manufactured their logs into lumber at their said two mills at the mouth of said river. The evidence tended to show that during the ownership of said saw mill by the Rich Bros. several piers, consisting of cribs of logs, filled with stones, had been placed in the channel of the river above the saw mills operated by them, and nearly two miles above the mouth of the river. Since the acquisition of said mills these piers have been enlarged and others constructed by the defendant company. These obstructions are, in the evidence, called "jam piers." They are 11 in number, and placed in near neighborhood with each other in the channel of the river, and are so arranged as, with the help of boom gates extending across the river on the lower side of the row of piers furthest down stream, to arrest and hold back the logs coming down stream. By opening a boom gate the logs are gradually suffered to float past these jam piers, and are sorted and guided into side booms constructed and maintained below by the defendant. This structure thus arrests the mass of floating logs, and enables those in control to sort them out and collect them in booms appropriated to the several owners. The logs of the plaintiffs and of defendant, together with the logs of other owners, come down the stream in a confused mass, and when the general progress is arrested by these jam piers the mass is stopped; the jam at times filling the river back for several miles. There was evidence tending to show that these piers were located too near the mouth of the river, and as a consequence there was not sufficient room for side booms between them and the lake; that,

as another consequence of such location, the operation of floating the logs through the jam piers and sorting gaps was much hindered by lake tides and winds, which caused at times a current up stream. There was also evidence tending to show bad management and dilatoriness in the operation of letting down and sorting the logs, by which great delays occurred. In consequence of such improper location of the "jam piers," deficient storage room, and bad management, there were such delays in the delivery of saw logs to the plaintiffs as resulted in discoloration, sap-rotting, and other damage to their logs and business. The evidence tended to show that the Ontonagon river was navigable only in the sense that it is suitable for the floating of saw logs and lumber. Its width at the point where the jam piers are standing is from 200 to 300 feet. There was some evidence to show that the original jam piers were constructed by a corporation known as the Ontonagon Boom & River Improvement Company, and that Rich Bros. controlled that corporation. There was no substantial evidence showing any connection between the said boom company and the defendant. Upon the contrary, it was shown conclusively that the defendant company had enlarged and continued to maintain the said jam piers since 1882, and that it had since exercised complete control over said piers and entire management of all logs running within "boom limits,"—a distance described as extending some 10 miles above the jam piers. There was also evidence to show that the land on one side of the river below the jam piers belonged to the plaintiffs, and that their river bank had been used for a storage boom by the defendant under a contract made March 25, 1891, by which defendant undertook to sort and store the plaintiffs' logs for a period of five years in consideration of the use of said bank and land for that term. It was also shown that plaintiffs had provided no side booms either above or below the jam booms, and had no facilities whatever for holding or sorting their logs from the general mass, and that they had continuously cut and floated logs down the river in expectation that they would mingle with the logs of defendant and others, and become a part of the mass held back by the jam booms, and would be let through as reached and sorted and boomed by the defendant, and that defendant had thus handled plaintiffs' logs without charge since May 12, 1890. There was also evidence tending to show complaints of dilatoriness and as to the location of the jam piers, but there was no evidence showing that plaintiffs had ever undertaken to sort or care for their own logs after they became part of the jam above the piers, or that they were ever in a situation to manage their logs after they reached the jam above the piers, or to store them after they should pass the boom gates, except such as was provided by the defendant. Upon the conclusion of all the evidence the trial judge directed a verdict for the defendant.

T. E. Tarsney and F. O. Clark, for plaintiffs in error.

E. H. Walker, for defendant in error.

Before LURTON and DAY, Circuit Judges, and RICKS, District Judge.

LURTON, Circuit Judge, after making the foregoing statement of the case, delivered the opinion of the court.

It is most manifest that the Ontonagon river is navigable only in a limited sense. It is a highway, nevertheless, in which every man who has occasion to use it has equal rights, though its only practical use is that which it affords for floating logs to market. The plaintiffs and the defendant, as well as other persons, were entitled to put logs into the stream to be floated singly to their destination at the mouth of the river. Logs were thrown in indiscriminately, ownership being signified by a brand on each log. When put in the river, they became a part of a general mass, often filling the river for miles, and the progress is that of those in advance. To separate them according to ownership, for either manufacturing at the mills

at the mouth of the river, or for placing into rafts or otherwise continuing their transportation, it was essential to the best interests of all that the floating logs should be arrested before reaching the lake, and the logs separated according to ownership, and guided into booms where they could be stored for further transit or manufacture. John F. Nester, one of the plaintiffs, concedes this most frankly, by saying in his evidence, that:

"Piers located at some point were necessary to our interests as well as the interests of others, to drive logs down the river. The objection to these piers is their location. The real embarrassment was the want of storage room between the piers and the mouth of the river."

It is clear that to make the navigable quality of this stream, short and narrow as it was, serviceable to log owners, it was almost essential that the use of the stream should be regulated by a single hand. Still the plaintiffs had the same right with the defendant to construct jam booms and side booms by which their logs might be separated from the general mass, and stored for use or transportation. That a multiplication of such facilities would injure rather than aid the general interests is evident, for every such obstruction would necessarily retard for a time the general movement of the whole mass. But the plaintiffs did not exercise this right by providing any facilities whatever for the sorting or reception of their logs. That neither they, nor any other owner of logs, did so, is doubtless due to the recognition of the necessity for a single management in order to obtain the best results. That the management of sorting and booming facilities, as well as the management of the running of the logs down the river, should be in the hands of persons not themselves interested as log owners, is evident; and the law of Michigan has accordingly provided for booming corporations, whose single duty and business shall be the control of the navigation of logging streams, by the construction and maintenance of facilities for the sorting and storing of logs for all who choose to use them. The defendant was engaged in lumbering and manufacturing logs into lumber upon this stream. For its own purposes it improved the Ontonagon by dams and other devices, and constructed and maintained the jam booms in question, as well as extensive storage booms below. It had an undoubted right to do this, provided its jam booms did not unreasonably obstruct the use of the river by others who did not care to avail themselves of the facilities furnished by it. That it was necessary to arrest the whole mass of logs for the purpose of obtaining and securing its own is evident from the nature of the navigation. This right, if reasonably exercised, would not be unlawful, whether exercised by a booming corporation or by an individual. Watts v. Boom Co., 52 Mich. 203, 208, 17 N. W. 809. That the plaintiffs had an equal right to maintain such piers, and to arrest the progress of the promiscuous mass for the purpose of securing their own logs, must be conceded. That they had a right to construct booms for the reception of their own logs after reaching the mouth of the river must also be conceded. That the defendant, in blocking the entire channel with its jam booms, so that passage was impossible except as it should allow, thereby monopolized the stream and maintained an unlawful ob-

struction, may also be conceded. But the plaintiffs never did exercise their right to provide for the sorting and storing of their own logs. If their logs had been permitted to go by, they would inevitably have gone into the open waters of Lake Superior. In this situation, they put their logs into the river, suffering them to become a part of the mass of logs composing the great jam above the piers of the defendant. They made no effort to themselves assort their logs, and provided no side booms, either above or below the defendant's piers. They suffered the defendant to sort and store their logs in a boom provided by the defendant, and then accepted them and proceeded with their further transportation. This was the course of business from year to year for a period of seven years after the plaintiffs succeeded to the business of Thomas Nester, who for many years before had had his logs handled in the same way. There was evidence of complaint from time to time of delays and of objection to the location of the piers where they were; but there was no evidence that plaintiffs ever demanded a right to pass their own logs through the jam boom, or that they had any way for saving them after they should pass through. We can but conclude, under the uncontradicted facts of the case, that the plaintiffs dealt with the defendant in regard to the sorting and storing of their logs, and recognized its right to handle them. Excluding consideration of the evidence tending to show a written special contract between the plaintiffs and the defendant, the only reasonable conclusion which a jury might draw from all the other facts and circumstances in the case is that the plaintiffs intended to avail themselves of the piers and booms of the defendant for the arrest of their logs before they should reach the open waters of the great lake, and of the services of the defendant in letting them through the jam piers and boom gates, and in storing them, after being separated from the logs of others, in a boom provided by the defendant, until plaintiffs should be ready to raft them to their own mills. Upon this state of facts the plaintiffs and defendant came into implied contractual relations, by which the one party delivered its logs to the other for a special service, and by which the other undertook to handle and care for the logs with reasonable dispatch and care. If the defendant had been an incorporated booming company under the law of Michigan, the facts and circumstances are such as would have subjected the plaintiffs' logs to the charges allowed by law to such companies, and placed them under its control and management until redelivered. Hall v. Boom Co., 51 Mich. 377, 402, 403, 16 N. W. 770; Lindsay & Phelps Co. v. Mullen, 176 U. S. 126, 146, 20 Sup. Ct. 325, 44 L. Ed. 400. It cannot be said that the plaintiffs were in any true sense compelled to use the jam booms and storage booms of the defendant. They might have provided their own facilities and taken care of their own logs, so far as that was consistent with the equal right of all other log owners. This they did not do, and, because they chose not to provide their own means for sorting and storing their own logs, they were compelled to use the facilities and services of the defendant. In no other sense was the use of the defendant's jam and storage booms compulsory. The conduct of the plaintiffs under the circumstances

is a waiver of any right to attack the means adopted by the defendant for handling and protecting their logs, as constituting an unlawful obstruction of navigation. Having availed themselves of those means, they are estopped to maintain a private action based upon the unlawful character of the means which they themselves have engaged, sanctioned, and licensed so far as they were able to do so.

The obstruction of a highway by land or water is a public nuisance. Those who construct or maintain it are subject to indictment, and under some circumstances an action at law for its abatement will lie. But no right of action by a member of the community will lie which is not based upon a special injury, differing in kind from that sustained by the general public. A ditch across a public street is a public nuisance. But a party whose use of the street has not been hindered cannot maintain a private suit for damages. To sustain a private action the plaintiff must show that he individually has sustained some special injury as a consequence of such obstruction. Undoubtedly, if the plaintiffs have shown that they undertook to use the Ontonagon river for the purpose of driving their logs to market, and were prevented from passing down the river by obstructions blocking the whole channel unreasonably, an action for the damage due to such unlawful delay will lie. But there is no evidence that the plaintiffs ever were hindered in the exercise of their legal right by the defendant's obstruction. In this respect the case is broadly distinguishable from that of Watts v. Boom Co., 52 Mich. 203, 17 N. W. 809. The defendant in the case referred to was a booming company organized under the statute law of Michigan. It was authorized to construct and maintain all necessary booms to aid in the driving of logs and rafts down the Tittabawassee river, provided such booms should be so constructed and used to allow, "as far as practicable," "the free passage of boats, vessels, logs and other floatables, along such waters." The plaintiff's logs were in a raft under his own control and management, and nothing indicated any purpose to avail himself of the booms or other facilities provided by the boom company. There was evidence tending to show that the defendant had willfully and totally obstructed the entire channel of the river with its piers and booms, and that such obstruction continued for an unnecessary and unreasonable time, and that the "plaintiffs were prevented from opening the piers or booms and breaking the jams by defendant," and thus were obliged to pass only when and as the defendant permitted. This delay undoubtedly constituted special damage; for the plaintiff in that case was prepared to care for his own raft after passing the pier boom, and endeavored, in the management of his own affairs, to pass on down the stream with his logs. In the case now before us it is not pretended that the plaintiffs' logs were separated from the logs of others. They were a part of the general mass of logs held back by the jam booms of the defendant. In that condition they could not pass the jam boom until those in front had passed, and could only be separated from others as they gradually went through the boom gates. The plaintiffs made no effort to pass their own logs through these gates, and made no demand that the jam should be broken or the gates opened, that they

might exercise their right of free navigation. The reason is plain. Their logs were not held together in one raft, as in Watts v. Boom Co., cited above. They could only pass as they were reached in the general movement of the confused mass. More than this; the plaintiffs had no means for securing them after they should pass the jam and sorting gates. Without storage booms the logs would inevitably pass into the open waters of Lake Superior. Plaintiffs say, "Concede this to be so; it would not follow that they would thereby be lost." But, on this record, we must conclude that such a course would be most extraordinary, and the loss inevitable and practically total. That the loss of the plaintiffs' logs was prevented by the alleged unlawful structure of the defendant is the only conclusion which could reasonably be reached by the jury. How, then, have the plaintiffs shown any special injury to themselves? They have been benefited, not injured, and their action must fail. True, there was evidence of dilatoriness, and consequent injury to logs from being kept too long in the water. But this sort of damage was less than the total loss which would have ensued but for the alleged unlawful obstruction of the defendant, and damages due to simple negligence or breach of the implied contract to use reasonable care in the handling of the plaintiffs' logs cannot be recovered in a suit based wholly upon the theory that the defendant was maintaining a public nuisance. We do not wish to be understood as approving or sanctioning the method by which the defendant corporation has monopolized the navigation of the Ontonagon river. We entertain little doubt of the unlawful character of the obstruction it has so long maintained. Conceding this, what we hold is that the plaintiffs have so far sanctioned, employed, and benefited by the defendant's course as to make it highly unjust that they should in this form of action be suffered to recover damages which really arose from the dilatory conduct of the facilities which they had voluntarily availed themselves of. The judgment must be affirmed.