## RIEDINGER v. DIAMOND MATCH CO.

### (Circuit Court of Appeals, Sixth Circuit. June 16, 1903.)

#### No. 1,168.

1. LOGS AND LOGGING—IMPLIED CONTRACT—MERGER IN SUBSEQUENT EXPRESS CONTRACT.

Where defendant, operating a boom in a river, into which logs of various owners were driven, made an express contract with plaintiff to sort and saw his logs delivered in the jam above the boom with reasonable dispatch, a previous implied contract to sort and deliver such logs with reasonable dispatch as they came down the river, by reason of defendant's operation of the boom, was merged in the express contract.

2. SAME—JUDGMENTS—RES JUDICATA.

Where the entire loss to plaintiff from the depreciation in value of certain logs resulted from a postponement of manufacture of the logs in consequence of defendant's breach of contract, and in a former action, in which plaintiff recovered judgment, the damages were charged to the delay in sawing the logs, such judgment was a bar to a subsequent action based on the theory of a breach of an implied contract by defendant, as the owner of a boom, to sort and deliver the logs below the boom with reasonable dispatch; such delay being included in the postponed manufacture of logs.

In Error to the Circuit Court of the United States for the Western District of Michigan.

F. O. Clark and Timothy E. Tarsney, for plaintiff in error.
Edwin Walker, for defendant in error.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

RICHARDS, Circuit Judge.  This was an action, on an implied contract, to recover damages for the failure of the defendant below to run, sort, and deliver, with reasonable dispatch and care, certain logs driven by the plaintiff below down the Ontonagon river, in Michigan, whereby they became worm-eaten, sap-rotten, and discolored. The case is brought here to review the action of the trial judge directing the jury to return a verdict for the defendant on the ground that the same damages claimed in this action were sought to be recovered in a   former suit between the same parties, in which the ruling and judgment of the court were adverse to the claim now made.

In his declaration the plaintiff below (now plaintiff in error) alleged that the Ontonagon river is a public, navigable river, upon which the plaintiff, in common with other citizens, had and has the right of free and unrestricted navigation, including the right of floatage of logs thereon; that the defendant on January 1, 1890, and for a period of eight years thereafter, "assumed control, management, and operation" of the river at a point about two miles above its mouth "for the purpose of booming all the logs placed in said river," and assumed to manage the river at the point of booming, and for a space of ten miles above said point, "for the purpose of running, driving, sluicing, and sorting" all the logs driven down the river by the plaintiff and others; that the plaintiff on January 1, 1893, and for four years thereafter, was engaged in the business of cutting, banking, running, and driving logs on the Ontonagon river, and procuring the manufacture of the same into lumber, in the transaction of which business it was necessary that the logs be run and driven through the space in the river controlled and operated by the defendant, and delivered at a point below; that the plaintiff, from time to time, in the spring, summer, and fall of 1894, to and including the summer and fall of 1898, delivered to the defendant "large quantities of pine saw logs, to wit, three million feet," within that portion of the stream controlled and operated by the defendant, "to be run, sorted, and delivered to the plaintiff by the said defendant with reasonable dispatch and care"; that the defendant received said logs, but did not run, sort, and deliver them with reasonable dispatch and care, but delayed the delivery to the plaintiff "into the booms as aforesaid" for an unreasonable space of time, by reason whereof damages resulted as follows:

"A large quantity of the logs of the said plaintiff, to wit, three million feet thereof, became sap-rotten, worm-eaten, discolored, and otherwise greatly injured and damaged, to wit, thirty-five per cent. in quantity, and twenty-five per cent. in value, became and were wholly lost to the said plaintiff, and a large quantity thereof, to wit, fifty per cent., became damaged and lessened in value, and the said logs, as a whole, were thereby greatly injured and

damaged by being and becoming worm-eaten, sap-rotten, and discolored by reason of the failure of the said defendant to deliver said logs with reasonable dispatch and care into the boom as aforesaid; and said plaintiff was prevented from floating, rafting, and manufacturing said logs into lumber, and selling the same, within the time in which said plaintiff could and would have otherwise done, had said logs been delivered to said plaintiff by said defendant with reasonable dispatch, and was so hindered until the value of the timber intended and designed to be manufactured therefrom had fallen in value two dollars per thousand feet since the time and times when the plaintiff could and would have obtained said logs, and manufactured the same into lumber, had the same been delivered by the said defendant in the booms as aforesaid with all reasonable dispatch, and that by reason thereof the said plaintiff has been damaged to a large amount, to wit, thirty thousand dollars."

It appears that, at the May term, 1898, of the court below, the plaintiff had sued the defendant in tort to recover damages alleged to have been sustained by reason of the unlawful obstruction of the Ontonagon river by the defendant, whereby the same 3,000,000 feet of logs were wrongfully held back in the river, and became worm-eaten, sap-rotten, and discolored. That case was decided by the court below in favor of the defendant, and this court on December 4, 1900 (105 Fed. 567, 44 C. C. A. 606), affirmed the judgment; holding that, under the circumstances of the case which are detailed in the opinion, an action in tort would not lie. Subsequently the present suit was brought to recover upon an implied promise to run, sort, and deliver the plaintiff's logs with reasonable dispatch below the jam piers or booms maintained by the defendant. At the same time the plaintiff sued the defendant for unlawfully obstructing the Ontonagon river by maintaining jam piers or booms near the mouth thereof, he brought suit upon an alleged contract with the defendant to manufacture and saw the same 3,000,000 feet of logs, which he had cut during the years 1894 and 1895, and recovered judgment for $1,203.80, which was subsequently paid and discharged. It was this action the court below held operated as a bar to the maintenance of the present suit. It is therefore necessary to examine with some care what the plaintiff then claimed.

In the declaration in that action the plaintiff charged: That the defendant on July 10, 1895, at Ontonagon, Mich., entered into a contract with him to manufacture into lumber about 3,000,000 feet of pine saw logs, which he had cut upon lands near the Ontonagon river or its tributaries during the winter and spring of 1894 and 1895, and which had been banked for transportation by driving down these streams, to the mouth of the Ontonagon river, where the defendant had its sawmills located. That the defendant agreed it would manufacture the logs into lumber, and deliver them upon its docks ready for shipment, and would so manufacture them "as soon as they should come down the said streams upon the drives"; charging $3 a thousand feet, board measure, for lumber cut by circular saws, and $3.50 a thousand feet for lumber cut by band saws. That in accordance with this agreement, in July, 1896, or thereabouts, the defendant cut, manufactured into lumber, and delivered to the plaintiff, 900,000 feet of said logs, but subsequently neglected and refused to complete its contract and manufacture the balance of the logs into lumber at the stipulated price, but in June, 1897, demanded $5 a thousand feet for manufacturing the

balance of the logs into lumber, which the plaintiff refused to pay. That on account of such refusal the plaintiff was compelled to remove the logs out of the Ontonagon river and into the waters of Lake Superior, and to pay for towing them to the Nester Mill; paying for towing and sawing $4 per thousand feet. That the plaintiff was unable to procure the manufacture of the logs into lumber at the Nester Mill, or any other mill, earlier than 1897. That he had 1,250,000 feet of logs towed to the Nester Mill for sawing, but they only cut 900,000 feet of merchantable lumber; the difference being "the depreciation in the merchantable quality of the logs resulting from the delay in the manufacture of the same, caused by the neglect of the defendant to manufacture the said logs, as agreed, as above set forth, and by the obstruction of the drive of the said logs on the said Ontonagon river and its tributaries from the spring of 1895 to the spring of 1897"; that the value of the timber cut at the Nester Mill, when cut, was worth in the market $2 a thousand feet less than it would have been, had it been cut at the mill of the defendant, as agreed, and on that account the plaintiff suffered a damage of at least $1,800. The plaintiff also suffered a loss of the value of at least 200,000 feet of merchantable lumber on the logs taken to the Nester Mill "by the damage that had accrued to the logs on account of the delay in cutting, by becoming worm-eaten, sap-rotten, and discolored." That the plaintiff has been unable to procure the cutting of the balance of the said 3,000,000 feet of logs, to wit, 1,250,00 feet, board measure, now remaining in the Ontonagon river, on account of the failure of the defendant to perform its contract, "whereby plaintiff has suffered much damage by the depreciation of the said logs by becoming worm-eaten, sap-rotten, and discolored." That the plaintiff has suffered damage by the delay in procuring the cutting of the logs into lumber through being deprived of the use of the money tied up in the logs since 1895, and being compelled to pay interest thereon, amounting to about $5,000. The entire damage was laid at $20,000.

It is to be observed that in each action the plaintiff sought to be made whole for the damage due to the worm-eaten, sap-rotten, and discolored condition of the logs when finally cut into lumber. Left too long in the water, their condition deteriorated, and as a result the logs cut into less lumber, and into lumber of inferior quality and value. In the former action the damage was charged to the delay in sawing the logs; in the present, to the delay in running, sorting, and delivering them. In the former, the plaintiff relied upon the express sawing contract; in the present, upon the implied booming contract. The trial judge held that, although the contracts relied on were different, the damage for which the plaintiff sought to be made whole was the same, and therefore the former action was a bar to the present suit. In determining whether he was correct, it is important to ascertain when the logs were delivered to the defendant under the sawing contract.

The declaration charged that the logs had been cut and banked for driving in the winter and spring of 1894 and 1895; that the sawing contract was made July 10, 1895, and under it the defendant agreed to saw the logs "as soon as they should come down the said streams

upon the drives." The jam piers or booms erected and maintained by the defendant to catch the logs driven down the Ontonagon in a promiscuous mass were located about two miles above the mouth of the river. Below them were the booms for the storage of the logs run through the jam piers and assorted. On each side of the river at this point, opposite the storage booms and below the jam piers, were the sawmills of the defendant, which were burned in August, 1896. The logs driven by various owners down the river in the spring of 1895 were jammed for some eight or ten miles above the jam piers. The plaintiff testified that there were some six or seven miles of logs between his logs and the jam piers, and about two miles of logs behind them. Such being the situation, when did the drive of the plaintiff end, and the duty of the defendant begin? In other words, when were the logs delivered to the defendant under the sawing contract, so it became his duty to care for, sort, and saw them? As we have pointed out, the declaration leaves the matter in doubt, but the testimony of the plaintiff clears it up. He testified upon the trial that the defendant agreed to saw his logs, provided he got them down to the boom, where they were held up, or, rather (he corrected himself), "to the jam"—he could not get them any further than the jam. That this was the plaintiff's construction of the sawing contract is confirmed by his telegram of July 22, 1897, to the defendant, in which he demanded that the defendant proceed at once to sort his logs in the Ontonagon river, and saw them, according to contract. In other words, after he had driven his logs down to the jam, where they became mingled with the mass of logs held back by the jam piers, it became the duty of the defendant to run them through the jam piers and sort and saw them. It was for the damages resulting from the failure to do this that he sued in the former action.

The present action is based upon the theory that the logs were not delivered under the sawing contract until they had been run through the jam piers and placed in the storage booms below, and that the delay which damaged the logs was occasioned by the failure of the defendant, with reasonable dispatch, to run, sort, and deliver the logs below the jam piers, under the implied booming contract. But if, from the fact that the defendant operated the boom, there was an implied contract to sort and deliver with reasonable dispatch the logs which came down the river on the drives, it was superseded by the subsequent express contract to sort and saw, with reasonable dispatch, the logs of the plaintiff delivered in the jam above the boom. It is to be noted, moreover, that, irrespective of the contract upon which the plaintiff relies, the approximate cause of damage in each case is the delay in manufacturing the logs. Delay in delivering the logs below the jam piers under the implied contract could not injure the plaintiff unless it prevented or postponed the manufacture of the logs. It could make no difference to the plaintiff whether his logs were above or below the jam piers, if at the time there was no mill accessible to cut them into lumber. In this connection, it is to be noted that after the defendant refused to saw the logs, except at an advance price (due to the fact that its mills burned down in August, 1896, and thereafter it was compelled to ship the logs by rail to its mills at Green Bay), the plaintiff

alleged he was unable to get any mill to saw his logs until July, 1897, when he towed 1,250,000 feet to the Nester Mill, and had them sawed there. He further averred that the balance of the 3,000,000 feet of logs still remained (in 1898) in the Ontonagon river, not on account of the failure of the defendant to perform its implied booming contract, but on account of its failure to perform its sawing contract, "whereby plaintiff has suffered much damage by the depreciation of the said logs by becoming worm-eaten, sap-rotten, and discolored."

While it is true that, upon the trial of the former action, the jury was instructed there was no evidence of any damage suffered by the plaintiff on account of the breach of the alleged sawing contract, other than the additional price of $1 per thousand feet paid for transporting the logs to the Nester Mill, and sawing them into lumber there, the question for us to determine, in reviewing the action of the court below, is not what was proved, but what might have been proved under the declaration in the former case. It is not what the plaintiff got, but what he sought to get, that we must consider. Having sued the defendant for damages because of the worm-eaten, sap-rotten, and discolored condition of his logs when sawed, alleging it was due to delay in sawing them, and having recovered a judgment in that suit, which has been paid, the plaintiff could not maintain another action for the same thing by shifting his position, and averring the condition of the logs was due to the delay in delivering them, especially in view of the fact that in the former suit he claimed the logs were delivered to the defendant under the sawing contract at the very time he now claims they were delivered under the booming contract, namely, when they reached the jam upon the drive. A mistake in launching litigation, or a failure of proof upon trial, cannot be corrected in the manner attempted in this suit.

In our opinion, the trial judge was justified in directing a verdict for the defendant, and the judgment of the court below is consequently affirmed.